[No. 12261. Department One. March 23, 1915.]

F. W. LORENZ, *Appellant*, v. F. A. BOOTH, *Respondent*.[1]

PHYSICIANS AND SURGEONS — NEGLIGENCE — WHAT CONSTITUTES. Where there is more than one method of treating a fractured bone, the attending surgeon is not liable for an honest mistake of judgment in selecting a method recognized as proper by a respectable minority of the medical profession.

PHYSICIANS AND SURGEONS—MALPRACTICE—ACTIONS — EVIDENCE— SUFFICIENCY. In an action to recover damages for malpractice in the treatment of a broken leg, on the ground of resulting infection to the limb, the evidence is insufficient to sustain a recovery, where it appears that the surgeon adopted the Lane, or plate, method for uniting the fracture and that the bone united properly, leaving the leg straight and of normal length; that infection set in, requiring prolonged treatment and the calling in of another physician to eradicate it; that infection may occur in any surgical case though carefully guarded against; but there was no evidence that the infection was caused by the method of setting the leg, or that every precaution looking to the prevention of infection was not exercised at the hospital where the leg was set.

Appeal from a judgment of the superior court for King county, Dykeman, J., entered April 3, 1913, upon granting a nonsuit, dismissing an action for malpractice, tried to a jury. Affirmed.

*Brady & Rummens* and *T. B. McMartin*, for appellant.

*Ballinger, Battle, Hulbert & Shorts* and *Peters & Powell*, for respondent.

PARKER, J.—The plaintiff seeks recovery of damages from the defendant, a practicing physician of Seattle, claimed to be the result of his negligence in the treatment of the plaintiff's broken leg. Upon the trial, at the close of the evidence introduced on behalf of plaintiff, counsel for the defendant moved the court to withdraw the case from the jury and render judgment in his favor, upon the ground that the evidence introduced in the plaintiff's behalf was insufficient to

[1] Reported in 147 Pac. 31.

call for the submission of the case to the jury. This motion was granted, and judgment rendered accordingly. From this disposition of the cause, the plaintiff has appealed.

On January 4, 1910, appellant's left leg was accidentally broken. The injury consisted of a simple fracture of the tibia. There was at that time no outward evidence showing that the tibia was in fact broken, the skin and flesh being unbroken and the leg apparently in normal alignment. The respondent was called shortly thereafter to treat the injury and, upon examination, discovered that the tibia was broken about four inches above the ankle. Respondent then set the broken bone and placed the leg in splints, it being necessary. to place the appellant under an anaesthetic in so doing. Respondent then discussed with appellant and his wife the various methods of treating fractures of this nature, particularly as to reuniting and holding the broken ends of the bone in place while healing. Respondent advised that the broken bone be reunited by the so-called Lane method, consisting of opening the flesh and inserting and attaching to the broken portions of the bone a plate so as to rigidly hold them in apposition and alignment. Respondent advised this method of treatment in preference to other methods by which the bone is held in place by outward appliances without cutting the flesh, expressing the opinion that quicker and better results would follow. This method of treatment being consented to by appellant and his wife, they relying upon respondent's advice, upon the following day appellant was taken to the hospital, where the operation and the insertion of the plate securing the broken portions of the bone in place was performed and the leg placed in a cast. Appellant remained at the hospital six days.

The evidence does not furnish any information as to what occurred at the hospital other than that the operation was performed. No details are shown throwing any light upon the manner of performance of the operation, nor as to the care or want of care there exercised relative to possible in-

fection of the injured parts. Appellant was then taken home, when the respondent cut a hole in the cast so as to render the flesh wound accessible for treatment, and then it was first discovered that the injured parts had become seriously infected. The broken parts of the bone thereafter grew together without resetting, so that they are in good alignment and there is no shortening of the leg.

In May, 1910, the plate was removed by the respondent, and because of the infection which still persisted and with a view of overcoming it, respondent operated upon the leg again in August, 1910, and in January, 1911, otherwise treating it at intervals since the injury was received. Appellant then being dissatisfied with the respondent's treatment, placed himself under the care of Dr. Gardner, who in treating the leg, with the view of overcoming the infection, operated upon it in June and October, 1911. None of these operations by respondent and Dr. Gardner involved the resetting of the broken bone; the first setting of it being followed by practically perfect results, so far as alignment and maintaining the normal length of the leg is concerned. At the time of the trial, the leg had practically regained its normal condition, except that it was not fully recovered as to its strength. Appellant was able to resume his usual work during only a portion of the time during the two years while being treated by respondent and Dr. Gardner. It is plain from the evidence that the only serious results to appellant, aside from the suffering and loss which would necessarily in any event flow from such an accident, is the infection which occurred, we assume, from some cause after the injury occurred.

Counsel for appellant proceed upon the theory that respondent was negligent in treating the broken bone by the adoption of the so-called Lane method, which required the opening of the flesh to the bone in order to attach the plate thereto, and that he was thereafter negligent in using unsterilized water and the vessel in which it was used to cleanse the injured parts when treating them. It is insisted that

the evidence warrants the conclusion that the infection came from one or the other of these causes, and that neither the use of the Lane method, nor the use of water in the vessel in its alleged unsterilized condition, are recognized by the medical profession as proper treatment.

The only information furnished by this evidence as to the Lane method being an improper method of treatment of a fracture of this nature by the medical profession, is that furnished by Dr. Gardner, the appellant's own physician. While he testified that the Lane method was probably not the best method of treatment of a fracture of this nature in the first instance, he testified, in part, relative to that method and its recognition by the medical profession, answering hypothetical questions of counsel describing this fracture, as follows:

"A. The first part of the question as to the reduction, I think the profession would be unanimous in reducing it and immobilizing it if possible, keeping it simple. If impossible to keep it simple and immobilize it, then we resort to the more radical means—we have authority for any means, and that is where the profession is split. At that time there was—I hardly know what word to use, but the journals were full of the introduction of the Lane plate at that time. The profession was so split that I can't tell you which predominated and which didn't. Later we don't believe that the Lane plate is universally used. Q. It was in an experimental state, do I understand at that time? A. The only part of that that I don't believe, it may be—this isn't positive with me, but I don't believe the majority of the profession would have operated quite so early. I wouldn't have, but Dr. Booth had authority for so doing. That is my honest belief. After that infection, the treatment from there on as conducted by Dr. Booth was all that anybody could have done. I would have done it; that is fighting the infection after the introduction."

He testified upon cross-examination as follows:

"Q. At that time in 1910, and from there on, this plate method was advocated then by a large part of the profession of surgeons, was it not? A. It was then and is now. Q. And

used by them? A. And is yet, as the last resort. I use it, I think every surgeon uses it when we fail in our simpler methods. Going back to my earlier testimony, we simplify these things, but being sure we get reduction and immobilization. Q. The first object to be attained beyond all others is reduction and immobilization, which means to get those bones fastened together in some manner as nature has originally made them, so they are going to grow back there, is that a fact? A. That is the fact, that is what I testified to. Q. Now the plate method is the best mechanical device of getting them put back in that shape, is it not? A. The plate method I think today is resorted to after the other methods have failed, I think except by Lane and some of his followers. I think they are in the minority today. Q. I am referring now to January, 1910, was that not a fact at that time, they resorted to that both early and late? A. What do you mean by early? . . . Q. What I am speaking about is this, at the time this operation was performed, the practice was quite general amongst those advocates of the Lane method of using the Lane method both early and late, is that not a fact? A. That word 'early' is what I will have to hinge on. Do you mean within an hour or so, do you mean within a week, or do you mean before primary union has taken place? Q. Yes, I mean within twenty-four hours? A. I don't believe the profession was unanimous, or in the majority, in the immediate operation. Q. I am not asking you who was in the majority, but wasn't that a method that was very generally advocated by a large number of reputable and skillful surgeons? A. It was advocated. Q. And used? A. Yes, sir. Q. And is yet? A. By some. Q. Now the difference that you contend for is that recently it has been contended that the Lane method ought not to be used until some little while after, seven or eight days after the injury, because of the traumatism that is supposed to exist, or may exist immediately or soon after the injury? A. Yes, by the followers of Lane. Q. But at that time those same men, and a large proportion of reputable surgeons, applied that method immediately after the injury as well as later, did they not? A. I don't believe a large proportion, but there were followers of that—Q. And reputable men? A. Reputable men."

The most that can be said of this testimony in support of appellant's contention that respondent was negligent in

adopting the Lane method, is that such method did not have
at that time the unanimous approval of the medical profession.
However, according to the only evidence here presented in ap-
pellant's behalf, that method did have the approval of at
least a respectable minority of the medical profession who
recognized it as a proper method of treatment. This, we
think, is enough to absolve respondent from negligence, so
far as his mere use of that method is concerned, there being
no showing that he exercised other than his best judgment in
choosing that method. In *Sawdey v. Spokane Falls & N. R.
Co.*, 30 Wash. 349, 70 Pac. 972, 94 Am. St. 880, this court
recognized the rule that if there be more than one recognized
method applicable to a particular case, the attending phy-
sician is not liable for an honest mistake of judgment in his
selection of the method of treatment.

Is there any other evidence calling for the submission to
the jury of the question of respondent's negligence, resulting
in the infection? We have already noticed that there is no
evidence whatever as to what occurred at the hospital other
than the mere fact that the first operation was there per-
formed during the six days appellant was there under treat-
ment. There is not the slightest evidence but that every
precaution known to medical science was exercised at the
hospital looking to the prevention of infection. Yet the in-
fection was discovered and had become serious at the end of
that period. Up to that time we have nothing whatever
pointing to negligence upon the part of respondent, unless
the mere fact that infection had taken place is to be regarded
as proof of his negligence.

Some contention is made that the respondent was there-
after negligent in the use of unsterilized water and the vessel
in which it was used from time to time. The vessel, as it ap-
pears, was a common wash basin which was cleansed with
warm water and soap by appellant's wife before use, and
when the water was put into it respondent would put into the
water some kind of antiseptic tablets the exact nature of

which are not shown. It is true that Dr. Gardner does give some testimony which suggests that possibly the water was not sufficiently sterilized, but in view of the uncertainty as to what the sterilizing antiseptic tablets used by the respondent consisted of, Dr. Gardner's testimony is of no substantial value as tending to show that the respondent's method of sterilization of the water would not ordinarily be insufficient or such as a prudent physician would use. Besides, we are to remember that the infection which respondent was combating during the whole period was that which was discovered when appellant was taken home from the hospital and which occurred before respondent had used the water and basin claimed to have been improper for want of sterilization. So we have then nothing of a substantial character which would lend support to appellant's claim of negligence on the part of the respondent resulting in the infection, other than the bad result. In other words, the mere fact that the infection occurred. In *Peterson v. Wells*, 41 Wash. 693, 84 Pac. 608, this court recognized the rule that a mere "bad result" is not of itself ordinarily sufficient to render an attending physician liable for negligence, that is, it is not ordinarily of itself proof of such physician's negligence. *Hoffman v. Watkins*, 78 Wash. 118, 138 Pac. 664; *Wurdemann v. Barnes*, 92 Wis. 206, 66 N. W. 111. See, note to *Whitsell v. Hill*, 101 Iowa 629, 70 N. W. 750, 37 L. R. A. 830.

Counsel for appellant rely principally upon our decision in *Sawdey v. Spokane Falls & N. R. Co.*, *supra*, where a judgment of nonsuit rendered by the trial court was reversed. A critical reading of that decision will show that there was evidence there of a somewhat pronounced character tending to show that the treatment of the injury was not the usual method of treatment. Also that a second operation upon the bone was necessary to obtain proper alignment. Counsel urges especially that the operations performed in this case, after the setting of the bone by respondent, were some evidence of improper treatment in the beginning. These opera-

tions, however, were not for the purpose of correcting the setting of the broken bone. We have noticed that there was no defect in that respect, since the leg was not shortened nor was it out of alignment. These subsequent operations show only the existence of the infection and were solely for the purpose of treating the infection. They throw no light whatever upon the cause of the infection, and we have Dr. Gardner's testimony to the effect that infection may occur in any surgical case though carefully guarded against, and that in this particular case the infection does not of itself furnish any evidence of its cause, nor want of care on the part of respondent. Counsel, also, in support of this branch of their argument, rely upon *Peterson v. Wells, supra*. That decision, however, we think is not materially different in principle from that of *Sawdey v. Spokane Falls & N. R. Co.*, *supra*, and is in the same way distinguishable from the present case.

Finally, we conclude that to have allowed this cause to be submitted to the jury would be to merely permit it to speculate upon the question of respondent's negligence. We think there are no substantial facts shown, in any view of the case, to warrant such submission to the jury. The judgment is affirmed.

MORRIS, C. J., HOLCOMB, MOUNT, and CHADWICK, JJ., concur.