[No. 13813.  Department Two.  May 8, 1917.]

ORA P. DISHMAN, *Plaintiff*, v. NORTHERN PACIFIC BENEFICIAL
ASSOCIATION *et al.*, *Defendants*.[1]

PHYSICIANS AND SURGEONS—MALPRACTICE — NEGLIGENCE — PROPER
METHODS—EVIDENCE—SUFFICIENCY.  In an action for malpractice in
treating injured tendons of a hand and wrist, the evidence is in-
sufficient to show negligence in failing to operate for the purpose of
suturing alleged broken extensor tendons, where unimpeached physi-
cians of equal ability disagreed as to the proper treatment and as to
the advisability of the operation, and the best course was shown to
have been uncertain, making a verdict rest upon speculation and
conjecture; since a physician is not liable for mistakes if he exer-
cises honest judgment and uses the methods recognized and ap-
proved by those reasonably skilled in the profession.

Cross-appeals from a judgment of the superior court for
King county, Tallman, J., entered April 18, 1916, upon the
verdict of a jury rendered in favor of the plaintiff, in an ac-
tion for malpractice.  Affirmed on plaintiff's appeal; reversed
on defendant's appeal.

*Griffin & Griffin*, for plaintiff.

*C. H. Winders* (*W. M. Thompson*, of counsel), for de-
fendants.

PARKER, J.—The plaintiff, Ora P. Dishman, commenced
this action in the superior court for King county seeking re-
covery of damages from the Northern Pacific Railway Com-
pany, the Northern Pacific Beneficial Association, and
Dr. A. W. Z. Thompson, one of the surgeons of the beneficial
association.  The damages sought to be recovered are for al-
leged personal injuries suffered by Dishman as the result of
malpractice and negligence on the part of Dr. Thompson in
failing to properly treat the injured extensor tendons of
Dishman's left hand and wrist.  The railway company and
the beneficial association were made defendants, and sought

[1]Reported in 164 Pac. 943.

to be held liable to Dishman upon the theory that Dr. Thompson was acting as their agent in the treatment of Dishman, in pursuance of the duty which it is claimed they each owed to him resulting from monthly payments to the beneficial association from his wages as an employee of the railway company entitling him to medical and surgical treatment as occasion might require. The case proceeded to trial before the court sitting with a jury, when, at the close of the evidence introduced in Dishman's behalf, a motion was made in behalf of each of the three defendants challenging the sufficiency of the evidence to support any recovery as against either of them. This motion was granted by the trial court as to the railway company and the beneficial association, judgment of dismissal entered accordingly, and denied as to the defendant Dr. Thompson. The trial thereupon proceeded as against Dr. Thompson, and at the close of the evidence introduced in Dishman's behalf, counsel for Dr. Thompson again challenged the sufficiency of the evidence to support any judgment as against him, and moved that the court so decide, as a matter of law, and enter judgment accordingly. This motion was by the court denied, the case was submitted to the jury, and a verdict rendered awarding damages in Dishman's favor and against Dr. Thompson. The sufficiency of the evidence was again challenged by counsel for Dr. Thompson by motion timely made for judgment notwithstanding the verdict, which motion was by the court denied, and judgment thereafter rendered in accordance with the verdict. Dr. Thompson has appealed from this judgment, claiming he is entitled to judgment absolving him from liability, as a matter of law; or, in any event, that he is entitled to a new trial. Dishman has cross-appealed from the judgment of dismissal as to the beneficial association, claiming that the court erred in its judgment of dismissal as to the beneficial association and that he is entitled to a new trial as against it. No appeal is taken from the judgment of dismissal as to the railway company.

On December 25, 1914, while in the employ of the railway company as a brakeman, Dishman was severely injured. He was standing on the stirrup of a freight car holding to one of the grab irons above by his wrist resting on the iron and his left hand down between it and the side of the car, when his foot slipped off the stirrup, resulting in the weight of his body forcing his wrist down upon the iron, injuring the carpal bones of his wrist and the tendons on the back of his wrist and hand. The severity of the injury evidently resulted from the fact that his hand was held between the grab iron and the side of the car so that his wrist was forced down upon the iron as a lever upon a fulcrum.

The injury was first treated by Dr. Hoye, the local surgeon of the association at Auburn, soon after the accident occurred. Dr. Hoye immobilized the wrist and hand with splints and bandages, and upon examination of it a day or two later, sent Dishman to the hospital of the association at Tacoma for treatment. Upon arriving at the hospital on December 28th, Dishman was placed in charge of Dr. Thompson, who was one of the hospital surgeons, for treatment. Dr. Thompson then removed the bandages and took an X-ray photograph of the wrist and hand, and again immobilized the injured parts. Dishman did not stay at the hospital for treatment, but went to his home at Auburn of his own accord, being entitled to remain at the hospital for treatment if he so desired, but choosing to go to his home and be treated as an outside patient, returning to the hospital from time to time for treatment. He went to the hospital several times for treatment up until February 25th, two months following the accident. During these visits Dr. Thompson redressed the injury several times and took additional X-ray photographs of the wrist and hand, giving Dishman liniment, with directions for its use. Dr. Hoye redressed the injury at Auburn two or three times during these two months, though he was not the physician having charge of the case. Dishman, becoming dissatisfied with the treatment received, did not go back to the hospital

after February 25th, but went to Dr. Silliman, at Seattle, who thereafter had charge of the case. On January 25th, evidently for the first time, it was discovered that one or two of the carpal bones were broken. This was dimly shown by the X-ray photographs, but was apparently overlooked up to that time. No portion of the outer flesh or skin of the wrist or hand was broken, or became broken at any time during the two months treatment by Dr. Thompson. The result of the injury was such that Dishman, while under Dr. Thompson's care, could not raise his hand or extend it backward beyond the projected line of the forearm, and it was with some difficulty that he could extend it even in a straight line with his forearm. This weakened condition of the hand and wrist, it is contended in Dishman's behalf, was caused by the rupture and severance of the extensor tendons, being those tendons on the back of the hand and wrist which enable one to open and extend the hand backward beyond the projected line of the forearm when the wrist and hand are in a normal healthy condition. As we proceed it will appear that the several surgeons who testified upon the trial do not agree in their opinions as to the extensor tendons being severed.

The alleged negligence in the treating of Dishman's hand and wrist during the two months following the accident, upon which Dishman rests his right to recover damages, is stated in his complaint as follows:

"That when the plaintiff arrived at said hospital for surgical treatment the defendants wrongfully, carelessly and negligently failed, neglected and refused to perform any surgical operation upon plaintiff's left wrist to bring the ends of the broken tendons together, and wrongfully, carelessly and negligently failed, neglected and refused to perform any surgical operation upon plaintiff's left wrist to suture or in any manner to fasten the ends of the broken tendons together, and wrongfully, carelessly and negligently failed to do anything whatsoever to afford the plaintiff any relief whatsoever from the condition he was then in, but wrongfully, carelessly and negligently allowed the plaintiff's left wrist, and extensor tendons thereof to remain without any treatment of any kind

whatsoever, and that thereafter for two months, during all of which said time the defendants had complete control of the plaintiff and complete control of the care and treatment of the plaintiff's left wrist, the defendants did not nor did either or any of them ever do anything whatsoever to benefit the plaintiff's left wrist or tendons thereof, excepting the application of bandages and liniment to the surface, which was wholly ineffective and afforded no relief or benefit whatsoever to the plaintiff or to his injured left wrist.

"That immediately after the time the plaintiff was injured and at all times during the time the plaintiff remained at the hospital of the defendants Northern Pacific Beneficial Association, the defendants, and each of them, knew, or by the exercise of reasonable care the said defendants would have known, of the rupturing and severing of the said extensor tendons of plaintiff's left wrist, and that, during all of said time, the defendants, and each of them, knew that the only proper treatment for the injured wrist of the plaintiff was by bringing together the broken ends of the said tendons and the suturing and securely fastening the same."

This is followed by allegations, in substance, that, had the wrist and hand been operated upon within a few days following the injury and the severed tendons brought together and sutured, the wrist and hand would have been, in a short time, rendered strong and useful; that Dr. Thompson's failure to so operate upon the wrist and hand has rendered them useless; that they will always remain so; and that, because of the lapse of time, the extensor tendons have so shrunken and lost their vitality that it has become impossible to unite and suture them. That the issue is narrowed to the question of Dr. Thompson's negligence in failing to operate upon the hand and wrist and suturing the alleged broken tendons is also rendered plain by remarks of counsel for Dishman made on several occasions during the progress of the trial, such as: "We are not complaining of any failure to treat broken carpal bones." "We are not complaining of his [Dr. Thompson's] failure to operate upon the bones of the wrist." We do not find in the record before us any claim of improper treatment by Dr. Thompson, other than his failure to operate upon

and suture the alleged severed extensor tendons.   We have thus noticed the nature of Dishman's injury and the negligence of Dr. Thompson, as claimed in behalf of Dishman, at some length, to the end that we have clearly before us the exact issue touching Dr. Thompson's negligence as claimed in Dishman's behalf.

This court has recognized the law to be that a physician is not an insurer of a cure in cases of affliction under his care for treatment, and that he is not to be held liable as for negligence or malpractice for mere failure to cure, or for bad results, because of his choosing one of two or more methods of treatment, when such choosing is an exercise of honest judgment on his part and the method so chosen is one recognized by the medical profession as a proper method in the particular case, though it might not meet the unanimous approval of the medical profession.   We shall presently review some of the authorities supporting and illustrating this doctrine, which we here notice in general terms only, as preliminary to a review of the testimony of the physicians given upon the trial touching the question of the negligence of Dr. Thompson in treating Dishman's hand and wrist, to wit, the question of his negligence in failing to operate upon the hand and wrist for the purpose of suturing the alleged broken extensor tendons thereof during the two months the case was in his charge. The following quotations from the testimony of the physicians are taken from the abstract of the evidence, which is, for the most part, in the usual narrative form, and therefore may not, in all cases, be the exact words used by the witnesses.   However, the correctness of the abstract as a statement of the substance of the testimony, as prescribed by the law and court rules relative thereto, is not challenged.   The trial occurred one year and two months after the accident, and one year after Dr. Thompson ceased to have charge of the case.

Dr. Silliman testified in Dishman's favor in part as follows:

"The plaintiff has been coming to my office for treatment for about a year.   When he first called upon me I found a hol-

low over the wrist, where the band that goes around the wrist had been torn, and some of the tendons that come from the forearm into the fingers had been torn off, and others had been dislocated and out of place. There was more or less displacement of the small bones of the wrist. There are eight bones in the wrist joint, and those had been sprained at the same time that the ligaments and tendons had been torn. The plaintiff told me that he fell in such a way that at the wrist there was a bend where naturally the parts would snap off. The tendons that I have referred to are the long extensor tendons that stretch out the hand and fingers toward the back. The only method that I know of to treat broken tendons is to sew the ends together as soon as possible; just as soon as the surgeon can get his apparatus together. There is no difficulty in diagnosing a case where extensor tendons have been severed, and I had no difficulty in diagnosing plaintiff's trouble when he came to me. . . . As I remember, the plaintiff came to me a day or two after he ceased going to the beneficial association's hospital—either on the 27th or 28th of February, 1915.

"Q. Is it proper treatment, Doctor, of an injured wrist, with broken tendons such as you found to exist in the wrist of the plaintiff, to fail to suture those tendons and to bring them together, for a period of thirty or sixty days afterwards? Under no circumstances. When the extensor tendons of the wrist are severed, the individual loses all strength in his fingers, as far as stretching them out and extending them. The muscles pull up, and the movement is practically lost, except by the use of some small weak muscles between the bones of the fingers. One of the first results of the severing is that they get smaller and shrivel up; then the muscles contract permanently. That makes it more difficult to sew it to the other parts and then, the parts are never in better condition for sewing than they are just after the injury. . . . If they are sewed together later it is hard to remedy the results, because the parts do not move freely, although you may succeed in sewing the ends pretty well together. After a delay of thirty or sixty days the nourishment is affected, and they have a tendency to shrivel up. The usual result, if an operation is performed immediately, and it is properly done, is that the patient will recover the use of the injured part.

"There was no breaking of the skin, no infection which would be likely to set up an inflammation, with the formation of pus that would complicate the situation, and the results would be less likely to be satisfactory if there had been any inflammation there which had ruptured the parts, but as there was none, you should expect a favorable result. . . . These injuries are not very common. It is well recognized that they do occur, and that the only treatment is suturing of the ends together as soon as possible. Q. And, doctor, now or at the time he came to you, in your judgment would it have been possible to have then operated upon his arm so as to have given him a useful arm? A. I think it would have been possible. Q. Well would it have been probable? A. It would have been probable that the ends of the tendons could have been sewed together so that he would have pretty fair extension. Q. Why didn't you operate on him for the purpose of suturing the tendons which you found torn loose? A. I told him that I could not guarantee a perfect result at that time, that the result of the sprain and of the tearing of the tendons and ligaments should have been remedied at once. Q. I know that is what you testified to, but I say, why didn't you operate —you had charge of the case, didn't you? A. To a certain extent. He had charge of his own case. Q. Did you recommend an operation? A. I told him that he should be the judge; that he might get good results even then, and he might not, but I would not guarantee good results then."

Dr. Cole testified in Dishman's behalf in part as follows:

"I do most of the X-ray work for Dr. Silliman and also for other physicians and surgeons; also lawyers. When I took the picture and examined the wrist, the tendons on the plaintiff's left wrist appeared to be ruptured. It seemed to be in about the same condition as it is now. I think he told me it was about sixty days after he was injured that I took the picture. The tendons that run over the joint of the wrist appear to be injured or ruptured. The one on the outside seemed to be more plainly ruptured from an examination of the plate. The extensor tendons of the fingers are also broken; I would not say how many, but several. I always consider that a broken tendon is never satisfactorily mended unless it is sutured, as a rule, and usually the time for suturing, if there is not much swelling, is immediately after the injury, or, if

there is swelling, after a few days, after the swelling recedes. I would not think that a reasonably careful surgeon would wait a period of thirty or sixty days for suturing tendons, such as I found to be injured in plaintiff's left wrist.

"I make a specialty of X-ray work, and from an examination of plaintiff's exhibit 'B' it would appear that the scaphoid bone had been fractured. All of the carpal bones of the left wrist show that they have been subject to more or less inflammation.

"Referring to treatment I would say that there would be some difference in the treatment accorded in case a man had a severed tendon, varying in regard to the various conditions. By that I mean if there was also a great disturbance and tearing loose of the ligaments, and breaking of the bones. I would always figure that the greatest injury was the one to be attended first. The carpal bones of the wrist perform a very important function, and sometimes when they are broken we first endeavor to get good apposition, and if that cannot be done it becomes necessary to cut out pieces of these bones. If there is considerable displacement we might endeavor to get a good apposition. When you ask whether or not, in case a tendon was torn, the doctor himself would determine whether or not he would try to get the tendons in apposition by operation or other methods, I would say it would depend upon his knowledge and experience and own judgment.

"In order to get the hand upon the level, such as the plaintiff can do, he must have the use of some of the extensor tendons, and the fact that he can get it up on the level, and then can reflex and open his fingers, indicates to me that at least some of the extensor tendons are working. If a man came to me with a hand that he could not over-extend, the first thing I would do would be to take a picture, and I would say, if there was no compound fracture, no opening of the skin, one would not want to stick a knife in there unless he thought there was some reason for it; and I would say that if a doctor really and honestly felt that he could treat patients without an operation and without laying open the skin and flesh, that would be the thing to do. The question as to whether or not a doctor would endeavor to avoid an operation, however, depends on the doctor sometimes. I would state, however, that there are numerous ligaments connecting the muscles and carpal bones of the ulna and radius, and that the wrist and

carpal bones are a very complicated structure, and a doctor would hesitate about cutting into the wrist and carpal bones unless it was absolutely necessary; unless he was a very skillful man he would hesitate. I do not know whether a doctor, finding a great displacement of the carpal bones and the breaking thereof, and the tearing of the ligaments, would put on splints or not. I do not see wherein he would get very much benefit from the splints. If there was much swelling he could put on a wet dressing. I would not say, however, that if he did put on splints he did not know what he was doing, because medicine is a matter of judgment sometimes, and of experience, and when a man goes to a doctor it is up to the doctor to use his good honest judgment."

Dr. Paschall testified in Dishman's behalf in part as follows:

"I made an examination of the plaintiff on Friday or Saturday of last week. I also examined the X-ray plate marked plaintiff's exhibit 'B,' and all I know about him is limited to the one examination I made and an examination of the X-ray plate, together with what I have seen in the court room. As to the condition of his wrist now, it seems to me that all of the tendons which extend the fingers are cut. It would not be absolutely necessary to be cut to have the appearance that the wrist has, but it seems that they are all cut, with the additional tendon here which goes down to the ulnar bone, which is called the extensor crepitum ulnaris. The bones may or may not be fractured. It is rather hard to tell at this late date, although the X-ray looks as if the bones of the wrist had been either broken or separated, and the ligaments torn, to a certain extent.

"Repairing of the tendon does not in any way interfere with the healing of the broken bones, while if the broken bones should heal ever so well, and we did not repair the tendons, the arm or hand or wrist would always be crippled. There is practically only one way of repairing the long tendons. In a very short tendon it is not as necessary, but in a very long tendon, the sooner the ends are sewed together, the better results you will get. You can operate as soon as the inflammation has gone down, which is usually from three to six days, and every day after that makes it much worse for the patient, and I would say that a reasonably careful and

prudent surgeon would not allow tendons to remain for thirty or sixty days without any operation, and he would not do it if he knew it. . . . Even if ruptured tendons are accompanied by fracture of the carpal bones of the wrist, the same treatment would be followed.

"Q. What, doctor, in your opinion, would have been the probability or improbability of his having a well hand if the operation had been performed at the end of sixty days, basing your answer on the condition which you find the plaintiff's wrist in at the present time, and your examination of the X-ray which has been admitted in evidence? A. I would say that the results would not have been as good as if it was done at once, but would be better than if it was done now. . . . There would be practically no danger from infection in operating to suture the tendons of the plaintiff's wrist. . . . A surgeon can never do any harm by making a nick. I mean if there is any doubt, in a modern hospital, you never can do any harm in cutting open a man and looking in. There is no argument against early operation in case of doubt."

Dr. Mowers, chief surgeon of the beneficial association's hospital at Tacoma, testified in Dr. Thompson's behalf in part as follows:

"Mr. Dishman came to the hospital on December 28, 1914, and was treated as an office case by Dr. Thompson. The injury to the wrist was treated by keeping the wrist immobilized by splints. He came in from time to time and the splints were removed and fresh dressings reapplied. . . . When Dishman first came to the hospital the wrist was treated by Dr. Thompson, who called me to see the wrist about January 25, at which time he showed me the X-ray plate and explained to me the treatment which he was giving him. I examined the wrist carefully at this time; it was swollen and tender. He was able to extend the wrist on the forearm, and the only limitation in the movements was an inability to completely overextend. There was a fracture of one of the carpal bones, and a depression over the insertion of the tendon of the extensor carpi radialis brevior, indicating a probable tear of this ligament. From the history of the injury and from the examination there had evidently been a severe stretching and probable tearing of the numerous ligaments uniting the small bones of

the wrist.   At the time I saw this man, this had not yet re-
paired, as was indicated by the swelling.   I did not at that
time consider it would be advisable to attempt to suture the
tendon which was probably torn.   Owing to the injured condi-
tion of the tissues, there was great danger of infection, which
would not only prevent the healing of the tendon, but would
possibly do very serious damage to the wrist.   Furthermore,
at this time there was no evidence, so far as the motion of the
wrist was concerned, of any bad results following from the
tear.   The injured condition of the ligaments between the
small bones of the wrist was not one which could be treated
surgically at all.   At this time the hand was again splinted,
on my advice, and I saw him about a month later.   At this
time the condition of the wrist was practically the same as at
my former examination.   The swelling was somewhat lessened.
He was still able to move the wrist in any direction, excepting
that he still could not completely over-extend.   A sufficient
time had elapsed to warrant the removal of the splints, and I
advised that these be removed, and that he be treated by
means of liniments and massage to the wrist, in order to see
how much the wrist would improve in this way.   Later on, if
necessary, an attempt could be made to suture the tendon.   I
did not believe at any time that the best results to the wrist
would warrant operative procedure.   Dishman did not return
to the hospital after the splints were removed, to the best of
my knowledge.

"It is my professional opinion, as a physician and surgeon,
that the treatment accorded to the plaintiff by Dr. Thompson
was in accordance with good medical practice.   .   .   .   I
think the wrist will be weak, owing to the injury of the liga-
ments of the wrist joint, not from injury to the tendons.   In
my opinion, no man with an injury to the small bones of the
wrist such as Mr. Dishman had would ever have a wrist as
strong as it was before the injury."

Dr. Argue, first assistant surgeon of the beneficial associa-
tion's hospital at Tacoma, testified in behalf of Dr. Thompson
in part as follows:

"As near as I recollect, the first time I personally examined
the plaintiff's hand was at the time Dr. Mowers and Dr.
Thompson were examining it in the X-ray room of the hos-

pital.  At that time [about January 25] I also examined
what X-ray plates had been taken, and remember of seeing
from the plates one or more of the carpal bones broken in the
wrist.  At that time I remember of Dr. Mowers testing out
the functions of the tendons of the forearm—of the wrist, and
at that time the plaintiff had the ability to extend the hand
on the wrist, on the level with the forearm and to extend the
fingers on the hand. . . .  A fracture of a carpal bone is
considered a serious fracture. . . .

"I have examined plaintiff's hand in court, and also ex-
amined it in the hospital, and I have examined the various
X-ray plates and, based upon my examinations of the hand
and the X-ray plates, I would state that I have never yet
seen any reason for believing that there were any ruptured
tendons in the plaintiff's injured hand.

"Q.  Doctor, will you please state to the jury, based upon
your learning, examination of authorities, and experience as a
surgeon, the propriety of cutting into a wrist or a joint
where there is no compound fracture, in cases where there are
fractures of the carpal bones of the wrist more particularly,
or of any of the bones going to make up the joint?  A.  I
would consider it poor practice to cut in and produce a com-
pound fracture in the carpal bones at an early date, for any
purpose whatever.  The reason for it would be the danger of
infection.  Where small bones are fractured, we find, if it is
a compound fracture, that is, where the skin is broken—that
is what we call a compound fracture where the skin is broken,
—that is the fracture communicates with the open world—in
such a case it is a frequent occurrence to have bone necrosis
take place.  Bone necrosis is the death of bone—it does not
live.  Consequently the fragments have to be taken out later
on.  On account of this risk, I think it is poor practice to
convert a simple fracture into a compound fracture, especially
in the presence of small bone.

"From my examination of the plaintiff's hand in the hos-
pital and examination of the X-ray plates and the history
which he gave, in my professional judgment, the proper treat-
ment would be that of immobilization of the hand and wrist
joint and forearm on a splint for a considerable time, which
varies in individual cases.  In this case I would keep it in a
splint at least thirty days, and follow by massage and passive
motion, to get the joint, as well as the ligaments and muscles

and tendons, limbered up as near the normal function as possible, for a reasonable time.

"In this particular case, taking into consideration the history of the case, it is my professional opinion, based upon my knowledge, experience, and study that, even if I diagnosed a broken tendon in connection with the other injuries, that is, the tearing of the ligaments and the breaking and disturbance of the carpal bones, the treatment I have outlined would be proper, and the tendon could be operated on later. I have myself operated on several tendons four and five months after they were severed, and brought their ends together, and got excellent results. In this particular case, with the condition of the carpal bones and the other injuries which we all know were sustained, even if I made a positive diagnosis of a ruptured tendon, I would consider the tendon the least important for the first thirty days, for it is my opinion, based upon personal experience and upon my knowledge and education, that it is possible to obtain good results in sixty and ninety days. This is based upon my actual experience.

"From the examination I made of the plaintiff's hand in the hospital and in the court room, it is my opinion at this time that the chief trouble in his wrist is due to the fracture of the wrist bones, that is, the carpal bones, and the tearing of the capsular ligaments that hold the carpal bones in position. There may be possibly some injury to the tendons; I would not state positively. From the fact that he can still extend his fingers and flex them after a lapse of a year and two months, it is my professional opinion that none of the communis tendons have been severed. I know of no authority in the medical science, nor do I know of any case, nor is there anything in my experience or knowledge of medicine or surgery, which would lead me to believe that any man could raise his fingers in extension a year after the communis tendons had been cut.

"It is not my opinion that if there were broken extensor tendons in this man's wrist that it would have been a difficult matter to suture them after he had left the hospital. Operations of that kind are performed after that, even after a year's time, or more than that. It is my opinion that the treatment accorded to the plaintiff was in accordance with scientific methods and proper professional treatment as followed by skillful members of the medical profession."

Dr. Calhoun testified in behalf of Dr. Thompson in part as follows:

"I was chief surgeon at the City Emergency Hospital for four years. During my experience and practice I have had occasion to treat injuries to the wrist, carpal bones, extensor tendons, and ligaments. I have examined the X-ray plates and have personally just examined the plaintiff's injured wrist and hand, and from the personal examination of his hand and wrist, from a study of the four X-ray plates, and from the history of the case, I would give it as my diagnosis that the plaintiff's injury is the result of a fracture of the carpal bones of the wrist, one or more of the carpal bones of the wrist, a sprain of the ligaments of the wrist, and a contusion, that means a bruise, an injury to the synovial sheaths of the wrist, the little sacs that lie between the different carpal bones of the wrist, setting up inflammation in the wrist and surrounding structures. Q. Did you diagnose either from that history or from the examination any broken extensor tendons? A. He has no broken tendons at all. . . . If in a particular case I positively diagnosed a severed extensor tendon, and found at the same time a disturbance of the ligaments around the carpal bones, and found that some of the carpal bones were fractured, the fracture not being a compound fracture, I would always avoid making a compound fracture out of a simple fracture, and in a case of violence such as you have mentioned, it would be my opinion that it would be inadvisable to open it up at once, especially where the synovial membranes between the little joints are inflamed. . . . There is always a questionable result in suturing tendons, but in quite a percentage of cases you get good results, and tendons are sutured with success even after a lapse of sixty or ninety days."

Dr. Elmore testified in behalf of Dr. Thompson in part as follows:

"I have examined the three X-ray plates, and in connection with Dr. Calhoun, I examined the plaintiff's wrist. I would say, from an examination of the X-ray plates, the history of the case, and my examination of plaintiff's wrist, that he is suffering from a fracture of two and possibly three of the carpal bones of the wrist. I do not think that there are any extensor or other tendons of his hand ruptured.

"I have personally sutured with success broken extensor tendons after the lapse of sixty or ninety days. In case of broken carpal bones, after fixation of a period of about four weeks, if complete function is not then restored, it is my judgment that the next treatment to be followed is passive and active motion, that is, when there is increased immobility of the joint. . . . Q. What motion do you find this man's hand to possess? A. He has the power of flexion and extension at the wrist joint through a limited degree. By that I mean he can't extend it just now, I should judge, over twenty —fifteen or twenty per cent of the normal motion of the wrist, but he has motion in both directions in this limited way. Approximately that (showing)—not much, but he has flexion and extension. Q. Would that indicate that any of those communis tendons were ruptured? A. It would indicate to me, and I also can feel that, at the present time, there are no ruptured extensor tendons. . . . You would not resort to open operation unless you had positive proof that there was a rupture of the tendons, which would disenable the man to extend his hand."

· Dr. Sharples testified in behalf of Dr. Thompson in part as follows:

"I have looked over the various X-rays and have personally this morning examined the plaintiff's hand. I have in mind the history of the manner in which the plaintiff was injured, he having his wrist on the grabiron, when his foot went out from under him, suspending his weight on the wrist; and from such history, an examination of the various X-ray plates, and an examination of the plaintiff's hand, I would diagnose the condition as one of a fracture of the carpal bones of the wrist and of the styloid process of the radius. There are no broken tendons shown in any of the X-ray plates, and in my judgment the plaintiff has no broken extensor tendons in his injured wrist."

Dr. Thompson, the defendant, testified in his own behalf as follows:

"I have in mind the time the plaintiff came to the hospital. When he came there I was doing the X-ray work, and the first thing I did with him was to remove the splints which had been put on, and I took a radiograph. I then told him to

return the next day. I then developed the picture and made an examination of the picture. I also examined his hand to find the amount of damage—the amount of function he had, and the amount of swelling, and took his own history. . . . The X-ray picture showed an unquestionable fracture of the scaphoid, and in my opinion there was a fracture of the styloid process of the radius. I could not find any reason to believe that there was a rupture of one of the extensor tendons, but I did believe there was severe laceration and rupture of the dorsal ligaments of the wrist joint, that is, the ligaments tying these small joints together. In giving him the treatment I have outlined, I used my best professional judgment, and that judgment still holds good today. I think it was proper treatment. When he came into the hospital he was able to extend the wrist, and was able to extend the fingers to the level, practically, with the back of the forearm. He was not able to over-extend the hand.

"Prior to this case coming to my care I had personally sutured tendons, and I know how to suture tendons, and have observed others and have assisted others, and the fact is that if there is nothing wrong with a man but a broken tendon, the thing to do is to immediately suture the tendon, but if there are complications or contusions, it is my judgment that it is proper to treat the case as I treated this man until a definite diagnosis is made. I have seen the plaintiff's hand in court since this trial begun and I have looked at the X-ray plate, plaintiff's exhibit 'B,' and from my treatment of this man at the time he was in the hospital, and my observation of his hand in court, and the X-ray plate, I do not believe any of the extensor tendons of his hand are broken, and I doubt very much if the plaintiff, in an accident such as he sustained, could have broken his tendons without absolutely opening up his entire wrist. The tendons are attached to the muscles, and it is my judgment that before a tendon can break loose there will be a rupture of the wrist, and I do not think these tendons could break without breaking out through the wrist, in an accident such as was sustained by the plaintiff."

We quote this testimony of Dr. Thompson more particularly for the purpose of showing his original diagnosis of Dishman's injuries, from which it appears that he diagnosed

Dishman's injuries substantially the same as the doctors who testified in his behalf upon the trial, being of the opinion that there was no severance of the extensor tendons. There is some conflict in the evidence as to whether or not Dr. Thompson discovered the fracture of the bones of the wrist until about January 25th, a month following the accident, upon an examination of the X-ray plates together with Drs. Mowers and Argue. But whatever failure he may have made to correctly diagnose the injuries as to the fractured bones of the wrist previous to that time, it would, in no event, have had any influence upon his treatment of the injury as he viewed the necessities of the case, it being also apparent that the judgment of the doctors who testified in his behalf as to his proper treatment of the case was not influenced in the least by the fact that he might have failed to discover the fractured bones during the first month following the accident.

We may here remark that there is nothing in the record before us indicating that any of the doctors who testified for Dishman and for Dr. Thompson were other than well qualified physicians and surgeons, or that their professional opinions, expressed in their above quoted testimony, were other than their honest convictions arrived at from a painstaking examination of the injured parts of Dishman's hand and wrist and the X-ray photographs thereof.

The testimony given upon the trial of this case is very voluminous, covering nearly six hundred typewritten pages of the usual size. By far the larger part of it is the testimony of physicians and surgeons, and is expert or opinion testimony bearing upon the question of whether or not Dr. Thompson should have operated upon the hand and wrist and sutured the alleged severed tendons thereof during the two months he was treating the injured parts. We have painstakingly read all of the testimony as furnished us in the abstract thereof, and find that, of eight physicians and surgeons testifying, other than Dr. Thompson, three are of the opinion that the extensor tendons of Dishman's hand and

wrist were severed, that Dr. Thompson should have operated upon the injured parts and sutured the extensor tendons, and that, in failing to do so, he was guilty of such unprofessional and unskillful practice as amounted to negligence, notwithstanding the carpal bones of the wrist were seriously disturbed in their setting, some of them were cracked, and the outer flesh of the wrist and hand was not broken. On the other hand, of the eight physicians and surgeons testifying, five, of apparent equal skill and learning in their profession with the other three, are of the opinion that the extensor tendons of Dishman's hand and wrist are not severed, that Dr. Thompson not only did not fail to exercise a reasonable degree of skill and judgment in not operating upon the injured parts, but that his treatment of the injury was, in their opinion, such as the judgment of a skillful and prudent physician and surgeon would, under all of the circumstances, have dictated. Not only that, the opinion of these five physicians and surgeons is, in substance, that Dr. Thompson would have been pursuing the correct course in not operating upon the injured parts even had he been of the opinion that the extensor tendons were severed, in view of the serious injury to the carpal bones of the wrist and the fact that there had been no breaking of the outer flesh and skin.

Such are the conflicting views of the learned doctors testifying in this case touching this manifestly intricate and delicate question of surgical science. To allow a jury or court to award damages against a physician for failure to perform such a delicate and risky surgical operation, where learned men of the profession have conflicting views touching the advisability of performing such an operation, as appears by the evidence in this case, would be, indeed, to allow the awarding of damages to rest upon mere speculation and conjecture. We have not noticed the testimony of these learned doctors at such length for the purpose of determining which entertained the correct and which the erroneous opinion touching Dr. Thompson's treatment of Dishman's hand and wrist,

but their testimony has been noticed by us with a view of demonstrating that neither Dr. Thompson nor any other physician could, in the light of Dishman's injury and in the light of medical and surgical science, as the evidence in this case shows, have determined with any degree of certainty whether the treatment he pursued, or the surgical operation which it is claimed he should have performed, would have produced the better results. Had he operated, as it is claimed he should have done, and the result been no better than the treatment he gave, or worse, as the testimony of a majority of these learned doctors seems to indicate, there would have been just as good ground for Dishman to rest a claim of damages upon against Dr. Thompson as that upon which Dishman's present claim of damages is rested.

The law applicable to the question of Dr. Thompson's alleged negligence, it seems to us, has been thoroughly settled by the decisions of this court. In *Just v. Littlefield*, 87 Wash. 299, 303, 151 Pac. 780, Judge Holcomb, speaking for the court, said:

"The principal question here is, whether a physician is, as a matter of law, liable for a wrong diagnosis and ensuing treatment based thereon, even where there may be an honest difference of opinion among members of the medical profession as to the diagnosis, if the diagnostician proceeded with due care, skill and diligence in treating the patient. The law is, of course, well settled that a physician is liable for a wrong diagnosis of a case, resulting from a want of skill or care on the part of the physician, and followed by improper treatment, to the injury of the patient. But, unless improper treatment follows, a wrong diagnosis gives no right of action. 30 Cyc. 1575; 22 Am. & Eng. Ency. Law (2d ed.), 802; 5 Thompson, Negligence, § 6717; *Richardson v. Carbon Hill Coal Co.*, 10 Wash. 648, 39 Pac. 95.

"It is now well settled that a physician is entitled to practice his profession, possessing the requisite qualifications, and applying his skill and judgment with due care, and is not ordinarily liable for damages consequent upon an honest mistake or an error of judgment in making a diagnosis, in

prescribing treatment, or in determining upon an operation, where there is reasonable doubt as to the nature of the physical conditions involved, or as to what should have been done in accordance with recognized authority and good current practice. 30 Cyc. 1578; *Merriam v. Hamilton*, 64 Ore. 476, 130 Pac. 406; *Wells v. Ferry-Baker Lum. Co.*, 57 Wash. 658, 107 Pac. 869, 29 L. R. A. (N. S.) 426; *Coombs v. James*, 82 Wash. 403, 144 Pac. 536; *Lorenz v. Booth*, 84 Wash. 550, 147 Pac. 31."

In *Dahl v. Wagner*, 87 Wash. 492, 495, 151 Pac. 1079, Judge Chadwick, speaking for the court, said:

"It has been the uniform holding of this court that where doctors of equal skill and learning, being in no way impeached or discredited, disagree in opinion upon a given state of facts, that the courts cannot hold a defendant in a malpractice suit to the theory of the one to the exclusion of the other. This is the logic of *Brydges v. Cunningham*, 69 Wash. 8, 124 Pac. 131. It is enough if the treatment employed 'have the approval of at least a respectable minority of the medical profession who recognized it as a proper method of treatment.' *Lorenz v. Booth*, 84 Wash. 550, 147 Pac. 31. The reason is obvious. A man who is called upon to exercise professional judgment is bound only to the exercise of reasonable skill and learning and diligence. 'He is not liable for mistakes if he uses the method recognized and approved by those reasonably skilled in the profession.' *Wells v. Ferry Baker Lumber Co.*, 57 Wash. 658, 107 Pac. 869, 29 L. R. A. (N. S.) 426; *Sawdey v. Spokane Falls & N. R. Co.*, 30 Wash. 349, 70 Pac. 972, 94 Am. St. 880; *Wharton v. Warner*, 75 Wash. 470, 135 Pac. 235; Shearman & Redfield, Negligence, §§ 433-435; Witthaus & Becker, Medical Jurisprudence, p. 30.

"This court will not assume to pass upon the facts or find the preponderance of the evidence upon any question of fact; nor can it be said that we are doing so in this case for the facts are not reasonably disputable. But we may assume to say, if men of skill and learning express contrary opinions upon admitted facts and such opinions differ, although not preponderating the one way or the other (as they do in this case), that the law will not impose a liability upon a professional man who acts within the reasonable limit of either opinion.

"Nor will a court hold a man guilty of malpractice when doctors disagree as to methods of treatment, although it be suggested that there is a more modern method than the one employed, or the surgeon employs a modern method to the exclusion of one theretofore adopted as a standard."

In addition to the previous decisions of this court, cited in the above quotations, those of *Hoffman v. Watkins*, 78 Wash. 118, 138 Pac. 664, and *Coombs v. James*, 82 Wash. 403, 144 Pac. 536, may be noted as in harmony with these views. It seems unnecessary to look to the decisions of other courts, in view of the extent to which the question has been dealt with by this court. We quote briefly, however, from two well considered decisions of other jurisdictions. In *Staloch v. Holm*, 100 Minn. 276, 283, 111 N. W. 264, 9 L. R. A. (N. S.) 712, Judge Jaggard, speaking for the court, said:

"Physicians and surgeons deal with progressive inductive science. On two historic occasions the greatest surgeons in our country met in conference to decide whether or not they should operate upon the person of a president of the United States. Their conclusion was the final human judgment. They were not responsible in law either human or divine for the ultimate decree of nature. The same tragedy is enacted in a less conspicuous way every day in every part of the country. The same principles of justice apply. Shall it be held that in such cases, where there is a fundamental difference among physicians as to what conclusion their science applied to knowable facts would lead to, then what they with their knowledge, training, and experience are unable to decide, and what, in the nature of human limitations, is not susceptible of certain determination, shall be autocratically adjudged by twelve men in a box, or by one man on the bench, or by a larger number in an appellate court, none of whom are likely to have the fitness or capacity to deal with more than the elements of the controversy? All the court can properly do if an action for negligence should be brought in such a case would be to direct a verdict for the physician. In *Williams v. Poppleton*, 3 Ore. 139, 145, Upton, J., said of a charge of negligence in the reduction of a dislocation: 'In cases like this the court and jury do not undertake to determine what is the best mode of treatment or to decide questions

of medical science upon which surgeons differ among themselves.' "

In *Ewing v. Goode*, 78 Fed. 442, Judge Taft, then circuit judge, observed:

"The naked facts that defendant performed operations upon her eye, and that pain followed, and that subsequently the eye was in such a bad condition that it had to be extracted, establish neither the neglect and unskillfulness of the treatment, nor the causal connection between it and the unfortunate event. A physician is not a warrantor of cures. If the maxim, 'Res ipsa loquitur,' were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' "

We are of the opinion that this record is wholly wanting in evidence, such as the law requires in cases of this kind, sufficient to show that there was a failure to exercise honest judgment on the part of Dr. Thompson in the treatment of Dishman's hand and wrist. Indeed, the evidence not only fails to show want of exercise of honest judgment, but, according to a majority of the learned doctors testifying upon the trial (and this is manifestly a question of opinion), Dr. Thompson properly refrained from performing the operation it is claimed he should have performed. We feel constrained to decide, as a matter of law, that Dishman cannot recover against Dr. Thompson, because of failure of proof of negligence on his part. It follows as a matter of course that no recovery can be had against the beneficial association, since it in no event could be liable for any negligence other than that of Dr. Thompson.

The judgment against Dr. Thompson is reversed, with direction to the superior court to dismiss the case with prejudice as to him. The judgment of dismissal as to the beneficial association, from which Dishman has cross-appealed, is affirmed.

ELLIS, C. J., MOUNT, and HOLCOMB, JJ., concur.