[No. 17992. Department One. January 31, 1924.]

ELIZABETH J. HOWATT, *Respondent*, v. W. A.
CARTWRIGHT, *Appellant*.[1]

PHYSICIANS AND SURGEONS (11)—MALPRACTICE—SUFFICIENCY OF
EVIDENCE—QUESTION FOR JURY. The negligence of a physician in
treating a fracture is a question for the jury where there was a
conflict in the evidence as to the nature of the fracture which was
treated as an impacted one; while a subsequent operation was nec-
essary to correct the result and indicated it to be unimpacted, and
the treatment wrong.

SAME (11). On the question of the negligence of a physician in
treating a fracture, it may be shown that a second operation was
necessary to correct the result.

Appeal from a judgment of the superior court for
Stevens county, Carey, J., entered February 17, 1923,
upon the verdict of a jury rendered in favor of the
plaintiff, in an action for malpractice. Affirmed.

*Louis Conyard* and *Cannon & McKevitt,* for appel-
lant.

*L. B. Donley, Mark F. Mendenhall,* and *H. H. Mc-
Culloch,* for respondent.

MAIN, C. J.—This is an appeal from a verdict of the
jury in an action against a physician and surgeon for
malpractice. The respondent, a woman about thirty-
six years of age, was thrown from a carriage in the
mountains near Tum Tum on August 8, 1921, and re-
ceived a fracture of the left femur, near the hip. A
doctor was called and advised that she be taken to a
hospital operated by the appellant. There she was
placed in bed and later an X-ray was taken and the fol-
lowing day the fluoroscope was used and the limb
placed in a Thomas splint. The appellant testified
that his examination disclosed a comminuted *im-*

[1]Reported in 222 Pac. 496.

*pacted* fracture. The appellant proceeded to use such methods as are known to surgery for the treatment of an *impacted* fracture. At the end of ten days, finding that the Thomas splint was occasioning trouble, the splint was removed and a straight extension substituted. This proving unsatisfactory, an angle box was used. The X-ray and the fluoroscope were never again made use of, but the limb was measured every day for three weeks in order to compare it with the right limb. After remaining in the hospital for some time, the respondent was released with the left limb some three-quarters of an inch shorter than the right, and with the left foot having an outward rotation of eighty degrees instead of the normal forty-five, and she found locomotion very difficult. In January, 1922, X-rays were taken by doctors other than the appellant, and thereafter in June, 1922, another operation was performed by one of such doctors for the purpose of curing the excessive outward rotation. This operation consisted of going into the shaft of the femur below where the break occurred and cutting the femur entirely through and turning the limb into a straight line allowing it to heal in that position. She remained in the hospital to recover from this second operation for four months, and was released with the outward rotation largely corrected, but with the limb remaining short, it being impossible to remedy that situation by any means. The placing of the limb in a better position enabled the respondent to better take care of the shortening.

The case has been presented and argued solely upon the theory that the only question in it is that of negligence in the treatment of the fracture, and nowhere in the trial or in the briefs has there been any suggestion that the negligence was solely that of an improper diagnosis.

We recognize the rule laid down so often that a surgeon is not liable merely because of a bad result. *Peterson v. Wells,* 41 Wash. 693, 84 Pac. 608. And that he is not responsive in damages in a malpractice suit, if the treatment which he employs is that which is recognized and approved by those reasonably skilled in his profession, practicing in the same neighborhood and in the same line of practice, and if he administers that treatment with a degree of skill and diligence as such practitioners ordinarily exercise in like cases. *Sawdey v. Spokane Falls & Northern R. Co.,* 30 Wash. 349, 70 Pac. 972, 94 Am. St. 880; *Wells v. Ferry-Baker Lumber Co.,* 57 Wash. 658, 107 Pac. 869, 29 L. R. A. (N. S.) 426; *Brydges v. Cunningham,* 69 Wash. 8, 124 Pac. 131; *Wharton v. Warner,* 75 Wash. 470, 135 Pac. 235; *Lorenz v. Booth,* 84 Wash. 550, 147 Pac. 31; *Dahl v. Wagner,* 87 Wash. 492, 151 Pac. 1079; *Dishman v. Northern Pac. Beneficial Association,* 96 Wash. 182, 164 Pac. 943; *Swanson v. Hood,* 99 Wash. 506, 170 Pac. 135.

We also recognize that it is not a question of fact for the jury, but the court will determine that there is nothing upon which the jury may pass where reputable physicians and surgeons of equal skill and learning disagree in their opinion as to what the proper treatment should have been, and that the jury will not be allowed to accept one theory to the exclusion of the other. It is enough if the treatment actually employed had the approval of at least a respectable minority of the medical profession and is recognized by such as a proper method. *Sawdey v. Spokane Falls & Northern R. Co.; Wells v. Ferry-Baker Lumber Co.; Wharton v. Warner; Lorenz v. Booth;* and *Dahl v. Wagner, supra.*

As was said in the *Dahl* case:

"But we may assume to say, if men of skill and learning express contrary opinions upon admitted facts and such opinions differ, although not preponderating the one way or the other (as they do in this case), that the law will not impose a liability upon a professional man who acts within the reasonable limit of either opinion.

"Nor will a court hold a man guilty of malpractice when doctors disagree as to methods of treatment, although it be suggested that there is a more modern method than the one employed, or the surgeon employs a modern method to the exclusion of one theretofore adopted as a standard."

But it is the appellant's contention that, applying these rules to the facts here, the case should have been taken from the jury and judgment rendered for him. The difficulty in arriving at this conclusion arises, however, from the fact that there is a dispute here as to the nature of the fracture. The negligence upon which the respondent relies to sustain her recovery is that the appellant failed to use sufficiently often the X-rays and fluoroscope and that, had he resorted to these aids, he would have discovered the conditions which led to the ultimate unsatisfactory result. The respondent concedes that the failure to use these aids was not negligence, if the fracture was an *impacted* one, saying at the beginning of her brief:

"We at the outset freely admit that according to all medical authorities we can find or have found and according to the testimony in this case there is no negligence on the part of a surgeon for failure to X-ray an *impacted* fracture of the femur so long as the length of the limb remains the same, as an impaction is a fixed condition and frequent views would be of no value, and if this was an impacted fracture there is no negligence on the part of appellant for failure to take X-ray plates from time to time. However we do

insist that the great preponderance of the evidence in this case is to the effect that the fracture was not impacted, and in such event we insist that according to the undisputed testimony in the case frequent X-rays are not only advisable but good practice makes the failure to make such X-ray examinations negligence, particularly in cases wherein the progress is not satisfactory.''

The testimony of the appellant was that he was dealing with an *impacted* fracture, and the corroboration that this was the nature of the fracture was furnished by three other doctors who had no opportunity for a personal examination of the respondent at the time she was under treatment, but who testified from an examination of radiographs taken in the January following the accident and after the appellant had completed his treatment. Opposed to this testimony, was the testimony of the surgeon who was called at the time of the accident and who sent her to the appellant's hospital. He testified that, on his examination by manipulation, he discovered the fracture, and at that time there was a very evident crepitus, which would positively negative the idea of the fracture being an impacted one; and that the appellant, in a conversation a few days after the accident, had said that the fracture was an oblique one. There was, also, the testimony of two doctors who were employed by the appellant at his hospital and called as witnesses in his behalf, who testified that the injury consisted of ''a fractured femur with displacement,'' and that, in the operation performed by the appellant in their presence, ''the broken ends were nicely approximated and that respondent's limbs were frequently measured,'' and ''there was never any shortening while the patient remained in the hospital.'' Under this situation, it was impossible that there should be an *impacted* fracture,

for with an impaction there must necessarily be a shortening.

With this dispute in the testimony, it was a question as to whether the fracture was an impacted or unimpacted one. If it is to be believed that it was unimpacted, then the expert testimony produced by the appellant to the effect that the use of the X-ray and fluoroscope is unnecessary in impacted fractures becomes inconsequential; for the testimony shows without contradiction that, if it was an unimpacted fracture, the X-ray or fluoroscope should be made frequent use of for the purpose of determining that no shortage was taking place and that the two ends of the bone were remaining in apposition. With this conflicting testimony as to the very nature of the fracture which was being treated, the court could not apply the rules to which we have referred and take the case from the jury. If the fracture was an unimpacted fracture, as testified to be by some of the witnesses, and the original reduction had been properly made as was testified to and the permanent shortening and outward rotation of the foot resulted, then the bones must have slipped in some way from the position in which they were originally placed by the appellant and the X-ray and fluoroscope according to the testimony should have been used to check up on the work and to disclose the progress of the approximation.

There was another circumstance which was of weight, and the jury had a right to take into consideration, and that was that a second operation was found necessary to cure the situation resulting from the operation by the appellant. In *Sawdey v. Spokane Falls & Northern Railway Co., supra,* and *Peterson v. Wells, supra,* the necessity of this second operation was recognized as producing some evidence of negligence. In *Cornwell v. Sleicher,* 119 Wash. 573, 205 Pac. 1059,

another operation was also found necessary in order to make a fractured arm reasonably usable, but that case is not authority for the proposition that the proof of the necessity of the second operation is in itself without any further proof sufficient to make a question for the jury whether the appellant brought to the treatment of the fracture that degree of care and skill usually brought to the treatment of similar fractures by surgeons practicing in his locality.

For the reasons stated, we must hold that there was sufficient evidence to go to the jury, and there being no errors assigned other than the failure to grant a motion for a directed verdict or a new trial because of lack of evidence, the judgment is affirmed.

PARKER, MACKINTOSH, HOLCOMB, and TOLMAN, JJ., concur.