[No. 18542. Department One. September 24, 1924.]

FRANK L. STICKNEY, *Appellant*, v. RUSSELL T. CONGDON et al., *Respondents.*[1]

NEW TRIAL (22)—PHYSICIANS AND SURGEONS (10-1)—MALPRACTICE —SUFFICIENCY OF EVIDENCE. In a malpractice case, it is error to deny a motion for a new trial, asked on the ground of insufficiency of the evidence to support a judgment for defendant, where there was no denial of positive testimony that the plaintiff would not have been burned by the proper use of the machine, and no denial that the gauges should have been under observation of some competent person and no conflict in the testimony establishing negligence, and no room to apply the interested witness rule (PARKER, J., dissenting).

PHYSICIANS AND SURGEONS (12)—NEGLIGENCE — EVIDENCE — RES IPSA LOQUITUR—INSTRUCTIONS. In a malpractice case, the rule of res ipsa loquitur is not applicable where the evidence is not in any degree conflicting, in which case, the question of the negligence of the physician is for the jury.

Appeal from a judgment of the superior court for Chelan county, Grimshaw, J., entered June 2, 1923, upon the verdict of a jury rendered in favor of the defendants, in an action in tort. Reversed.

*Wilbra Coleman, Crollard & Steiner,* and *R. V. Welts,* for appellant.

*Corbin & Easton,* for respondents.

TOLMAN, J.—This is an action against a physician and surgeon to recover damages for injuries caused by burning with an X-ray machine. The case was tried to a jury, which returned a verdict in favor of the defendants. From a judgment on the verdict, the plaintiff has appealed.

It is conceded that appellant was burned while under examination with an X-ray machine owned and used

[1]Reported in 228 Pac. 849.

by the respondent Russell T. Congdon, and apparently it is also conceded that such a burn can be produced in but two ways, i. e., either by too long an exposure or the use of too strong a ray. The principal defense, and that which no doubt accounts for the verdict, was that some unknown factor, probably a fluctuating line current, which the doctor could not reasonably have foreseen, and for which he should not be held responsible, entered in and caused the burn.

The machine used was a standard make and equipped with all of the usual controls and gauges designed for the purpose, and sufficient to apprise the operator of the amount of current being used and enable him to regulate it. The gauges and controls were situated in a room distant, and separated by a hallway, from the dark room where the ray was applied to the patient—a not unusual manner of installation—and the first question presented is whether, in the exercise of reasonable care, an operator or technician should have been kept stationed at the gauges and controls in order to keep watch of the current being used, and regulate it, if necessary, in order to keep within the zone of safety. There was then no stabilizer known or in common use, though the evidence indicates that a practical stabilizer has since been perfected.

There is ample evidence that, before beginning the examination, the settings were properly made on the machine so as to deliver, under ordinary conditions, only the required current, but thereafter and throughout the examination of the patient, both the doctor and his assistant, the operator of the machine, remained at all times in the dark room where the ray was being applied, and no one was stationed at the gauges and controls to observe and regulate the current.

On the part of the appellant, testimony was produced

showing that the machine used had a milliampere
meter with scale markings, by the use of which the
operator could measure and read the current, as it
was applied, on the face of the dial; that it is well
known to the profession what is and what is not a safe
dose to be used in doing fluoroscopy, which was the
operation employed upon appellant, and that there was
no reason why the operator of such a machine should
permit the application of anything more than what is
called a safe dosage, and therefore no need for the
burning of a patient in such an operation; that, if the
gauges should stick, the operator would at once per-
ceive it by the ordinary and proper use of these ap-
pliances, and that someone, either the operator or his
assistant, should have his eyes on the meter so as to
observe whether or not there were fluctuations in the
current sufficient to cause the burn, because the
patient is dependent upon the operator in that respect.

As against this evidence we find testimony showing
that it is customary, or at least not unusual, to install
the gauges and controls in a room other than the dark
room where the ray is applied, because in the dark
room it is difficult, if not impossible, to read the gauges
while the current is being applied, and in a separate
and lighted room such reading is simple and easy. But
we find no testimony even remotely tending to show
that when so installed it is usual or customary to leave
the gauges unobserved during the operation, or that
such a course is recognized in the profession as being
proper practice under any conditions. Dr. Congdon
testifies:

"Q. And all you know in regard to how the machine
was set was what your technician told you? A. Well,
I would answer not what she told me but what she was
told to do. Q. But if she didn't do as she was told to
do, then all you know about it is what she told you?

A. Yes. Q. Now was there any special instruction—there was no special instruction given in this case, was there, doctor? A. The special instruction in this case was to get the machine ready for a fluoroscopic examination according to the usual technique. Q. Is that what you told her? A. I told her to set the machine for a fluoroscopic examination. Q. And she set the machine for the Moneymaker examination? A. I believe she did—I am sure we put him through first. Q. Then the machine was not changed after the Moneymaker examination until the Stickney examination was made, was it? A. I don't believe it was. Q. The machine was so set and the Moneymaker examination just before the Stickney examination that there is a claim made at least that Mr. Moneymaker was burned? A. No, I wouldn't answer that, because that would not be the fact at all. You made the statement that the machine was so set that there was a claim that Mr. Moneymaker was burned—the setting of the machine very possibly did not have anything to do with Mr. Moneymaker claiming he was burned. Q. Do you know whether Mr. Moneymaker was burned? A. He may have been. Q. He may have been burned at that particular time? A. Yes, he may have been.   .   .   .
Q. Doctor, all that you are attempting to say in this case is that you believe that Miss DeForest set the machine according to the usual technique, is that it? A. More than that. Q. What more than that? A. What more? I believe that Miss DeForest carried out my instructions about setting that machine for the usual fluoroscopic examination. Q. You believe that? A. I do. Q. You made no personal examination? A. I did not, I could not state positively that I did. Q. Now the machine carries certain controls? A. Yes, sir. Q. Were those controls under your observation any time? A. They were not under my observation all the time. Q. Were they at any time, doctor, during that examination? A. No sir—if you mean by controls— Q. I mean the different current measures? A. No, sir, they were not.''

Further than that, the evidence on behalf of the respondent does not go.

Just as markedly the evidence fails to present a conflict upon the question of negligence in failing to use a shutter or cone to confine the ray to the portion of the patient's body under examination, which would have made impossible the burning of the arm not under examination. But as a new trial is necessary we need not discuss this question.

The gauges and controls being parts of the machine and its equipment, manifestly made a part in order that they might be used; it being shown that, by their proper use, the results here complained of could not have happened; there being no denial of the positive testimony that the gauges should have been under the observation of some competent person during the application of the current, there was no conflict in the testimony upon the question of negligence, and it would seem that if such an instruction had been asked for, the court would have been required to tell the jury that negligence had been established as a matter of law, notwithstanding the cases are rare in which such an instruction may be given. But the abstract reveals no such request. The point was, however, saved by the motion for a new trial, based among other things, upon the insufficiency of the evidence to support the verdict. If there were a conflict in the evidence we could not say that the court abused its discretion in denying such a motion for a new trial; but where there is no conflict, and where the interested witness rule does not apply, why should negligence not be dealt with as we have so often dealt with contributory negligence, and a new trial be directed by this court? Our right to do so seems to be recognized in *Winningham v. Philbrick,* 56 Wash. 38, 105 Pac. 144, and *Aboltin v.*

*Heney,* 62 Wash. 65, 113 Pac. 245. Such is the general rule.

"Where a case has been tried by a jury and a verdict rendered therein, and the losing party desires to test the sufficiency of the evidence to support the verdict, a motion for a new trial is indispensable. It is the province of the jury in the trial of civil cases to consider the whole volume of testimony, estimate and weigh its value, accept, reject, reconcile and adjust its conflicting parts and be controlled in the result by that part of the testimony which it finds to be of greater weight. As the jury is the exclusive judge of the evidence, it must in reason be the exclusive judge of what constitutes the preponderance of the evidence, and when that judgment is reached upon evidence sufficient to support a verdict, it should not be disturbed by the court. Even if the evidence is barely sufficient to uphold the verdict, no error is committed by refusing to grant a new trial on the ground of the insufficiency of the evidence to sustain the verdict. But where the evidence offered for the party for whom a verdict is rendered, conceding to it the greatest probative force to which, according to the laws of evidence, it is fairly entitled, is insufficient to support or to justify the verdict, it is the duty of the court to set it aside and grant a new trial. A new trial will be granted where a verdict is wholly unsupported by evidence in an essential particular, or where both parties have, without fault, failed to introduce material evidence." 20 R. C. L., § 59, p. 277, and cases there cited.

Complaint is also made because in instructing the jury the trial court refused to apply the rule of *res ipsa loquitur.* The court did instruct in harmony with the rule laid down in *Wells v. Ferry-Baker Lum. Co.,* 57 Wash. 658, 107 Pac. 869, 29 L. R. A. (N. S.) 426, and *Howatt v. Cartwright,* 128 Wash. 343, 222 Pac. 496, and still being satisfied with that rule, we hold that, where the evidence is in any degree conflicting, such

an instruction, rather than one applying the rule of *res ipsa loquitur*, is proper.

The judgment appealed from is reversed and the cause remanded with directions to grant a new trial.

MAIN, C. J., HOLCOMB, and MACKINTOSH, JJ., concur.

PARKER, J. (dissenting)—I dissent. I am unable to see that the trial court abused its discretion in refusing to grant a new trial.