[No. 18509.   Department Two.   May 9, 1924.]

ALEXANDER L. KEMP, *Appellant,*, v. D. E. McGILLIVRAY et al., *Respondents.*[1]

PHYSICIANS AND SURGEONS (10-1)—MALPRACTICE—NEGLIGENCE—PROPER METHODS—EVIDENCE—SUFFICIENCY.   The evidence was insufficient as a matter of law, to show negligence by a surgeon in the treatment of a spiral fracture of the tibia, although the ends of the bone were not in complete apposition and there was some shortening of the leg, where it appears that he employed a recognized treatment approved by those reasonably skilled in the profession in that locality, and administered the same with ordinary skill and diligence, and produced a good result; and wilful concealment of his own want of skill is not shown by his representations that it was all right and properly set, and that he disciplined a nurse for advising the patient to obtain a specialist (PEMBERTON, J., dissents).

Appeal from a judgment of the superior court for Clallam county, Ralston, J., entered June 29, 1923, in favor of the defendants, notwithstanding the verdict of a jury rendered in favor of the plaintiff, in an action for malpractice.   Affirmed.

*G. F. Vanderveer,* for appellant.

*J. Speed Smith* and *Henry Elliott, Jr.,* for respondents.

MITCHELL, J.—This is an action to recover damages for the alleged malpractice of a physician and surgeon in his treatment of a spiral fracture of the tibia.   From a judgment for the defendants notwithstanding the verdict of the jury, the plaintiff has appealed.

Doctor McGillivray's wife was made a party defendant.   The doctor will be spoken of as the respondent.   The evidence in the case is clear.   The respondent was promptly called in to take charge of the case, and

[1]Reported in 225 Pac. 631.

at that, or any other time, there was no agreement or understanding concerning the method of treatment to be employed or results to be accomplished, other than that implied in the law. Five surgeons testified in the case, one of whom was the respondent. One of them, not the respondent, was called by the appellant. All of them testified that the method of treatment used by the respondent—traction weights and pulleys—is recognized and approved by those skilled in the profession practicing in that community and generally, and indeed the most, if not all of them, testified that was practically the only proper method, and that, while appellant was under the respondent's care, he was given that treatment with skill and diligence.

It appears that, within three or four weeks, the appellant, discovering that the ends of the bone were not in complete apposition and that there was some little shortening of the leg, had it operated on by Doctor Lile by a re-fracture and what is known as the Lane method, using a plate to put the ends of the bone in full apposition.

Doctor Black, called by the appellant, said that he thought from the X-ray photos that the leg would be about half an inch shorter, but that it would be just as firm as before it was fractured. Doctor Buckner testified that there would not have been enough shortening of the leg to interfere with the use of it, that it would not cause limping, that the leg would have been just as serviceable as before the injury, and that an operation such as Doctor Lile performed was not necessary at all. Doctor Taylor, who assisted the respondent in reducing the fracture, and who saw the appellant thereafter while under treatment and who examined the X-ray plates and photographs, testified that, under the respondent's treatment, there would not have been any appreciable shortening of the leg, that

he would have had a perfectly good leg except anatomically, and that would have been fully compensated within a year or so and the appellant would never have known that he had had a broken leg. The respondent testified in detail as to his treatment and care of the appellant and of the good functional result obtained; that the shortening was less than half an inch, and that in consultation with his patient he advised against the operation later performed by Doctor Lile, telling him that within a few months the leg would be as good as the other one.

Doctor Lile, who performed the open operation known as the Lane method, testified:

"There are three methods which are used by the majority of the profession and applicable to all cases of this kind. The first is a simple reduction and placing the leg in a cast. The other method and the one applicable to a case of this kind is traction, which is by weights and pulleys. The third method is the open operation, and there are several types of this method. In my opinion, and in the opinion of a good many surgeons, to open and operate on a fracture that you can get a good functional result from by other means, is not good, for the reason that you have the danger of infection. The main object is to obtain a useful and functional limb in all fracture cases. Unless there is a definite indication for an immediate operation it should be delayed until the soft tissues have a chance to regain their vitality, and that length of time may vary.

"Q. The fact that the leg was still swollen indicates that those tissues had not been revitalized? A. That is an indication, yes. Q. Unless the surgeon was positive that he could not get a functional result he would not be justified in opening a leg while swelling was present? A. Unless for some reason he had some good idea that he would not get a functional result, yes. Q. Isn't there great possibility of infection? A. Yes. . . . After I had learned the history of the case and found out what had been done I advised the plaintiff

that his leg would be a good functional leg and that in all probability he would have no further trouble with it after it had knit and he was walking on it, but that he would have some shortening, probably 3/8-inch which would be compensated by nature, and that if it was my leg I would leave it alone.  I told him that this shortening would not cause lameness and that I believed the danger of infection after an operation would more than offset the danger of having a leg that would not be perfect.  I believe that had I not operated he would have had a good functional leg. . . . The reason I performed this operation was that Mr. Kemp was determined that he was going to get it.  When I took the patient to Seattle I found a definite bony union which would indicate that he would have had a good union in his leg.  In the reduction of fractures, in the first place the callous begins to form along where the bones are touching, but nature has so arranged things that in projecting ends the callous will slowly fill in and the sharp ends are absorbed so that in case the cavity was filled in with callous and in this place where this long spike is, it was filled in and was so tight that we had some difficulty in breaking it loose.  In reducing a fracture I would say that the question of alignment is more important than the question of apposition.  If you have a bone that shows a straight line down to the weight bearing portion of your foot that is alignment. Q. Looking at that Exhibit (Plaintiff's 'A') I will ask you to tell the jury whether that in your opinion was a good functional result?  A. I so expressed it at that time and I still believe that.  Q. That is, if it had been left alone and you had not operated?  A. Yes, sir.''

The testimony shows that the leg as set by the respondent had good alignment, though, as stated, the ends of the bone were not in full apposition—alignment being the more important of the two.

The law applicable to the case is well settled.  In the recent case of *Howatt v. Cartwright,* 128 Wash. 343, 222 Pac. 496, wherein prior decisions of this court are cited, the rule is stated to be:

". . . he is not responsive in damages in a malpractice suit, if the treatment which he employs is that which is recognized and approved by those reasonably skilled in his profession, practicing in the same neighborhood and in the same line of practice, and if he administers that treatment with a degree of skill and diligence as such practitioners ordinarily exercise in like cases."

Under the rule, the respondent cannot be successfully charged with malpractice in this case.

But more particularly it is alleged and claimed on behalf of the appellant that the respondent wilfully and falsely and for the purpose of concealing from the appellant the respondent's negligence and lack of skill, repeatedly informed the appellant that the fracture had been properly reduced and that the ends of the bones were in correct apposition and that he would secure a strong, straight, normal union. The appellant himself testified that the respondent told him "it was all right and properly set." Certainly, by all the testimony in this case, a good result was accomplished as measured by the law applicable in such cases. This charge is made because the ends of the bone were not in full accord and because of a slight shortening of the leg, which were in no sense inconsistent with a good functional result such as was obtained, and is based largely upon the fact that the respondent, upon learning that one of the nurses on seeing the X-ray plates or photographs had advised the patient to get the services of a specialist, warned her, in the absence of the appellant, against the practice of talking such things to his patients. This was fully explained as a matter of discipline and necessity in the safe treatment of all patients. The nurse, who was not a trained or graduate nurse, but only what is termed a practical one, frankly admitted that she was not competent to say

whether the bone had been properly set, what shortening there would be, nor how much shortening would be required to produce lameness, and that if she were a physician she would not want a layman to be talking to her patients about her professional work.

It is true that the appellant testified that at times the doctor, upon request, did not show him the plates, and that those he did let him see were not very clear. Commencing some two days after taking charge of the case, the respondent continuously or frequently made X-ray plates and pictures of the broken bone as long as he had charge of the case. The plates were not developed at the hospital, and he testified that as soon as they could be used "I would take the film to the light and show him the bones and I would show him how the callous would form and fill in the space." Of this there was no denial by the appellant. In the presence of the appellant, the doctor showed the X-ray plates or films to appellant's visitors and explained them to them. True, the respondent said nothing about a probable shortening of the leg until later; but why should he? He was not asked about it and he knew he was getting a good result. Later on and about as early, under all the testimony, as it was practical to resort to the Lane operation, if one was to be had, and upon learning that the appellant wanted a leg that was perfect, so-called, anatomically, it was the respondent who advised getting Doctor Lile and who wired him to come. This proof falls short of evidence, or fair inference of such, showing any wilful or other withholding or concealing of information as charged by the appellant.

Reliance is had by the appellant on *Lewis v. Dwinell,* 84 Me. 497, 24 Atl. 945, where the physician failed to discover a severe rupture of the perineum, in a confinement case; *Logan v. Fields,* 75 Mo. App. 594, where the doctor continued treatments after he found that

the patient's condition was incurable and encouraged the patient to continue, advising him that he was improving and that he would cure him; *Burk v. Foster,* 114 Ky. 20, 69 S. W. 1096, 59 L. R. A. 277, where the patient suffered a fracture of the arm and a dislocation of the shoulder, and the doctor failed to discover the dislocation while caring for the patient and treating the fracture; and the case of *Manser v. Collins,* 69 Kan. 290, 76 Pac. 851, which was similar to the Kentucky case. No such situation is presented in this case, and upon due consideration of the whole record, we are satisfied the judgment appealed from is correct.

Affirmed.

MAIN, C. J., BRIDGES, and FULLERTON, JJ., concur.

PEMBERTON, J., dissents.