[No. 23537.   Department One.   August 3, 1932.]

JAMES SEARS, *a minor, by Rodney Sears, his guardian ad litem, Respondent,* v. JOHN E. LYDON, *Appellant.*

RODNEY SEARS *et al., Respondents,* v. JOHN E. LYDON, *Appellant.*[1]

[1]Reported in 13 P. (2d) 475.

*Hartman & Hartman* and *Stratton & Kane,* for appellant.

*Vanderveer & Bassett,* for respondents.

STEINERT, J.—Two actions are here consolidated, in both of which it is sought to recover damages for malpractice. The first is brought on behalf of an infant who, it is alleged, sustained the immediate injuries; the other is brought by the parents to recover for expenses incurred by them and for loss of the earnings of the child. The defendant has appealed from the judgment on the verdicts.

The appellant is a sanipractor, licensed under the drugless physicians act of 1919. In the month of January, 1930, Lessie Sears, one of the respondents herein, employed the appellant to attend her during the period of her pregnancy and expected childbirth. Appellant entered upon and performed the professional services. October 25, 1930, marked the inception of labor pains on the part of Mrs. Sears. The appellant and his assistant were at once called and immediately responded. Early in the forenoon, a six and three-fourths pound girl was born. It was then ascertained that a twin was to follow. The second child, the infant respondent, exhibited what is known in medical parlance as a "transverse presentation," the left arm preceding the head and trunk and protruding from the uterus. Appellant made several attempts to replace the arm and shift the position of the child's body, but was unsuccessful. The delivery became difficult. Finally, by the application of extra force and effort in pulling upon the protruding arm, the child was born, but as a result of the force used its arm was broken. In all other respects, however, the child, which weighed seven and a half pounds, was in good and healthy condition.

The complaints as drawn are not based upon any charge of negligence in the manner of delivery, nor was recovery sought for the breaking of the arm. The negligence relied on was in the subsequent treatment and care of the child. The complaints allege that the appellant, in attempting to reduce the fracture by the use of splints, negligently bound the arm so tightly with non-elastic adhesive tape as to prevent circulation of the blood; further, that he thereafter negligently failed to inspect and loosen the bandages; and that as a result of his negligence blood poisoning developed, finally necessitating the amputation of the arm near the shoulder in order to save the child's life. The evidence offered by respondents, like their pleadings, sedulously avoided any charge of negligence in the delivery as the cause of the fracture.

The defendant in both of his answers denied specifically each act of negligence charged, denied that blood poisoning resulted from any negligence on his part, and denied that amputation was necessary in order to save the child's life. In answer to the complaint of the parents, he alleged, by way of an affirmative defense, that the injuries to the child were occasioned by the contributory negligence of the parents in causing the bandages to become tampered with and misplaced, and in permitting the amputation to be made without the knowledge of appellant and without attending a conference of physicians and surgeons which appellant had planned, and at which a course would have been adopted to save the arm.

The evidence offered by the appellant was to the effect that, after it was discovered that the child's arm had been broken, which the appellant testified was unavoidable, he undertook to reduce the fracture. He outlined in detail the method followed by him and the treatments accorded by him on his subsequent visits,

made at least once, and sometimes twice, a day. He testified, that, after washing the child's arm, he carefully examined and dressed it, realizing at the time, however, that it was practically irreparable, and concluding to "give it, at least, a last chance or hope," in an endeavor to save it. He took some measurements of the arm but was unable to reduce the fracture at that time.

On the next day, he brought out some pieces of Yucca wood, a material used by physicians in making splints to aid in the reduction of fractures. These he cut to the proper size and length and then put them in boiling water to make them pliable. Then, after wrapping the arm in antiseptic gauze and cotton, he bound the pieces of Yucca board around it in such a manner as to hold the arm in place in normal position. He then strapped the baby to a pallet which he had designed, to hold it in a fixed and comfortable position. Examinations were thereafter made once or twice a day and the bandages adjusted whenever necessary. He further testified that, from the beginning, the fingers showed blue spots or marks, particularly about the nails, which he said had been caused by the tearing of the muscles and flesh during delivery; these, however, he said, had begun to turn gray, indicating improvement in circulation.

There was considerable evidence of a contrary kind, from several witnesses, to the effect that the condition of the fingers and hand steadily grew worse from the very beginning, so much so that the father became apprehensive and spoke to the appellant about it several times. Finally the condition became alarming and at the end of about nine days the child was hastily taken to the appellant's office, where a portion of the bandages was removed. On seeing the condition of the arm the appellant at once pronounced it a case for the

hospital. The child was immediately taken by the father to the Orthopedic Hospital where, upon examination by Doctor Eikenbary, it was found that gangrene had set in. An emergency operation being necessary in order to save the child's life, the arm was amputated at the shoulder. The appellant was not present at the operation. When Doctor Eikenbary removed the wrappings he found that the arm was bound with three splints made of tongue depressors, which are paddle-like pieces of wood used by physicians in holding down the tongue when examining the throat. These depressors had been fastened to the arm with adhesive tape and were bound so tightly that they had sunk into the flesh leaving distinct marks upon it when removed. Doctor Eikenbary testified that "the arm itself was perfectly dead from about two or three inches below the shoulder down; the entire arm was perfectly dead, perfectly black." While the appellant was still attending the child, prior to the operation, he repeatedly told the father that the child was improving and would be all right soon.

The appellant vigorously insisted in his testimony that he had not used tongue depressors and that their presence substantiated his contention that the bandages had been tampered with in his absence. He also asserted that he had noticed on several of his visits to attend the baby that the wrappings had been altered, although he never called this to anyone's attention or gave any directions with reference to it. The evidence also showed that, after the arm had been set, the father, becoming apprehensive, had requested that an X-ray be taken. This was done and the X-ray showed that the ends of the bone were over an inch out of alignment. The arm was then reset by appellant with better, but not perfect, success.

The testimony is too voluminous to be given in further detail. It explored the field of obstetrics, particularly that branch of it which deals with "transverse presentation;" it explained the symptoms of gangrene and the effect of stoppage of the circulation, which is indicated by black spots upon the fingers; it went exhaustively into what appellant had done in his treatment of the arm, and what various witnesses saw him do and what they were told by him regarding the improvement of the child's condition; and, finally, it elaborated upon the cause, or causes, of the loss of the arm, according to the various theories of the medical experts.

Appellant first contends that there was not sufficient evidence to take the case to the jury. This point was first raised by appellant's motion for judgment notwithstanding the verdict. The rule is well settled that such a motion will not be granted unless the court can say, as a matter of law, that there is neither evidence nor reasonable inference therefrom to sustain the verdict. Malpractice cases form no exception to this rule. *Stickney v. Congdon,* 140 Wash. 670, 250 Pac. 32; *Samuelson v. Taylor,* 160 Wash. 369, 295 Pac. 113.

In our opinion there was ample evidence to take the case to the jury upon the question whether the result was occasioned by appellant's negligence as alleged in the complaint. There was evidence, of course, on which the jury might have found a different verdict, but it was, nevertheless, a question within their province.

Appellant next contends that the jury reached its verdict as a result of prejudice induced by respondent's counsel in his cross-examination of the appellant. Upon direct examination, appellant had qualified him-

self as an expert in obstetrics and bone surgery, having six different licenses to practice his profession. On cross-examination, he enlarged upon his training and experience. Counsel for respondents, in an attack upon his general knowledge with reference to the human anatomy, elicited certain admissions from him and provoked certain statements by him, all of a medical nature, from which the jury might have drawn some derogatory conclusions regarding his professional knowledge and skill. Although the cross-examination of the appellant regarding his qualifications and his treatment of the child's arm was insistent, extensive and trenchant, yet the record fails to disclose that any objection whatever was made to any part of it. No objection having been raised to the nature or extent of the cross-examination or to the manner in which it was conducted, no error can now be predicated thereon. *Keough v. Seattle Electric Co.,* 71 Wash. 466, 467, 128 Pac. 1068.

Appellant's final assignment of error is upon the giving of certain instructions and the refusal to give others requested by appellant. Counsel complains because the court gave a portion of instruction No. 5, reading as follows:

"I also instruct you, however, that when a physician, no matter to what school of medicine he may belong, assumes to reduce and treat a fracture the law requires that he shall possess that knowledge and that degree of professional skill usually possessed by physicians engaged in like practice in the same or a similar community. And if he holds himself out as having special knowledge or skill in the reduction and treatment of fractures, or, in other words, if he holds himself out as a specialist in such matters, then he is required to possess that knowledge and degree of skill usually possessed by specialists in that line of surgical work in the same or a similar community. If he fails to possess such skill or knowledge, or, possessing it, if he fails

to exercise it with reasonable care he is guilty of negligence in the eyes of the law and is liable in damages to any one who may be injured as a natural and proximate result.''

Counsel's criticism of this instruction is that it assumes that the appellant is to be judged as to his qualifications as a specialist without regard to the school of healing to which he may belong, and also that it assumes, in the absence of any testimony to that effect, that the appellant held himself out as a specialist in the particular line of surgery. The general rule for which counsel contends, and on which the criticism is based, is no doubt correct, but in this instance the appellant had testified that he was an expert in bone surgery and that he so represented himself to the child's father at the time of undertaking to reduce the fracture; further, that the method employed by him was the one followed by ''the schools generally of practitioners in the general practice,'' and advocated by standard written authority. There was no evidence that appellant, in reducing the fracture, employed a method peculiar to his own school of healing or different from that employed by physicians in the general practice. He identified his method with that of the practice generally. Under the evidence as presented to the jury the instruction was proper.

Counsel's most serious complaint is to the refusal of the court to give an instruction limiting the damages to the results of negligence in binding the arm too tightly and not giving it proper treatment, excluding, however, any recovery for injury resulting from making a transverse delivery. Under the pleadings as originally framed and under the evidence as introduced by the respondents, such an instruction, we think, would have been entirely proper, in order to prevent any possible confusion on the part of the jury as to

the exact issues before them. As stated before, the respondents did not claim in their pleadings, nor contend by their evidence, that the appellant was liable for the original fracture. But appellant did not rest content with the limited issues presented. He sought to fortify his position by advancing and emphasizing a theory which contained the germ of an additional issue, namely, that of original negligence in the delivery, causing the fracture of the arm. He testified that the fracture *could not possibly* have been avoided. A number of appellant's witnesses testified to the same effect. Respondents accepted the challenge thus offered them and upon cross-examination and in rebuttal adduced evidence from which the jury were reasonably entitled to infer that the negligence of the appellant preceded the attempted reduction of the fracture and lay in the manner of delivery. All this evidence, on both sides, went to the jury wholly without objection. Appellant, having invited a contest upon a new field, in fact having chosen the ground himself, cannot be heard to say that the jury should not have been allowed to determine that issue. Had the respondents themselves endeavored *to* open that field of inquiry upon their pleading, an objection by appellant would have been properly sustained, but appellant cannot with one hand erect a barrier of defense and with the other brush it aside. The logic of appellant's contention, if followed to its ultimate conclusion, would enable a defendant to admit or establish a distinct act of negligence on his part, other than that with which he is charged, and then to escape its consequences on the ground that it had not been specifically alleged. That position would, of course, not be legally tenable, and to permit such a course of procedure would be unreasonable and unjust. In *Sjong v. Occidental Fish Co.*, 78 Wash. 4, 138 Pac. 313, the court said on page 7 :

"In this court the appellant objects to the ruling of the trial court permitting the respondent to introduce evidence, over its objection, as to acts of negligence not specifically set forth in the complaint. But we think the appellant is not now in a position to successfully urge the objection. Had the court sustained the objection, and were the case here on appeal by the other side, we would say unhesitatingly that no error had been committed. But a different rule obtains when the trial court treats a defective complaint as sufficient and permits each side to fully present his evidence upon the real issue in the case. In such instances, this court is enjoined by statute to hear such causes upon their merits, disregard all technicalities, and to consider all amendments which could have been made as made. Rem. & Bal. Code, § 1752 (P. C. 81, § 1255). True, if it appears that the complaining party has been surprised or misled by the want of sufficient allegations in the pleadings, and has thereby been prevented from fully presenting his case to the jury, the error is fatal to the verdict, but nothing of this sort appears in the present record."

The case at bar presents even less reason for considering the objection raised, for here the appellant himself deliberately presented a new issue of negligence, not contained in the complaint, and made no objection to respondents' attempt to meet it.

The judgment is affirmed.

TOLMAN, C. J., MITCHELL, HERMAN, and PARKER, JJ., concur.