[No. 27723. Department Two. December 2, 1939.]

ERMA NELSON, *Individually and as Administratrix, Appellant*, v. COLUMBIA CLINIC, INC., *Respondent.*[1]

[1]Reported in 96 P. (2d) 575.

*W. H. Sibbald,* for appellant.

*Edgar P. Reid* and *Whittemore & Truscott,* for respondent.

GERAGHTY, J.—This action was brought by the plaintiff, individually and as administratrix of the estate of her son, Donald Burnham, to recover for financial loss sustained by her by reason of the death of her son, alleged to have resulted from the defendant's negligent treatment of him while in its clinic as a patient. The plaintiff, in her complaint, asked for damages in the sum of twenty-five hundred dollars for herself, a like sum for the deceased's estate, and the further sum of $446.04 for funeral expenses. The jury returned a verdict in favor of the plaintiff for the exact amount asked for funeral expenses, and the defendant moved for a judgment notwithstanding the verdict. The motion was granted, followed by the entry of a judgment of dismissal. The plaintiff appeals.

Saturday night, January 30, 1937, shortly after seven o'clock, the deceased, eighteen years of age, was riding in a car driven by Loren Forsman; a third young man was riding with them. As the car was driven along a street in the vicinity of Lake Sacajawea, in Longview, it was deflected from its course by a button in the roadway, struck a telegraph pole, and plunged into the lake.

The car overturned and came to rest in water about waist high, with its wheels in the air. The night was cold, and the lake was covered with a thin sheet of ice. After extricating himself from the overturned car, Forsman went to the aid of the deceased, who was under water. He was unable to get him out of

the car, but held his head above the water until assistance came. The deceased was hurried to the respondent's clinic, where he died on the morning of the second day thereafter. The death certificate states that the cause of his death was "Pulmonary edema and circulatory failure due to injury and inhalation of muddy water into lungs."

The acts of negligence alleged in the complaint were that the respondent did not make any attempt to diagnose deceased's injuries, but placed him, while still unconscious, on a bed in a ward near an open window, in extremely cold weather, his body being only partially covered, and that death was caused wholly by the carelessness and negligence of the clinic.

The appellant testified that, on reaching the clinic; she found her son in bed, out on the porch in the solarium.

"Dr. Steward was sewing up his leg. I asked the doctor not to give him any anesthetics. His body was frozen hard and he was unconscious. The nurse said he had received such a shock it would not be necessary in sewing up the cut on his leg and forehead. The doctor sewed up the cut on his head. There was no other doctor in the room or in the building. I called Dr. Hackett and asked him to come over and take charge of Don and do his best for him. Dr. Hackett said he would come. When he got there he examined him and said the boy was not in any danger and that there was nothing for me to worry about. They did not pump the boy's stomach out. Dr. Hackett said I could go home as there was nothing I could do there and they would call me if there was any change in Don's condition. Before I left they moved Don into room 203. They put him in the bed next to the window. The wind was blowing and his head was wet. He was not well covered and constantly kicked the covers off. The door opened at the foot of his bed. They had to come in and go out that way. It was

drafty in there with the door and window open at the same time. They brought the oxygen in about an hour after I came in. Dr. Steward was in and out of the room. They had a special nurse come in at 11:00 o'clock. . . . He was just ice-cold. He had one hot water bottle at his feet. I would close the window and the nurse would open it. The water Don threw up was thick and muddy. There were small rocks and gravel and muddy water in what he threw up. He filled up one of the pans and it ran over onto the bed. They started giving him oxygen about 10:30. He regained consciousness about 2:30. The first thing he said was, 'Take that thing off my nose, will you?' They raised it off just a minute. He seemed to rest and then all of a sudden he would seem to sink away. He tried to sit up in bed and would stand up and they put him in a strait-jacket."

She testified that her son was not given anything to eat or drink until Sunday afternoon; that his night-shirt "was open in front and he could throw the covers off and they left him by that open window all the time." A special nurse was in charge. Sunday morning, Dr. Hackett ordered a pneumonia jacket, and the nurse said she would put one on. Appellant remained with her son until 11:30 Sunday night, and no pneumonia jacket had been put on during that time. Dr. Hackett told her that a stomach pump was not necessary.

Appellant's brother testified that the head of the patient's bed was within sixteen or eighteen inches of the window, with no screen between. He heard Dr. Hackett tell the nurse to put on a pneumonia jacket. She put a towel on him and pinned it on one side.

Forsman, the driver, who, following the accident, had pleaded guilty to a manslaughter charge, testified that he called on the deceased at the clinic the

morning after the accident and found him "lying there laughing and smiling and said he 'sure felt swell.' "

The appellant's evidence, in as far as it tended to show any lack of care in the treatment of the deceased, was contradicted by evidence produced by the respondent, which tended to show that the care and treatment given by its staff was in accordance with approved methods. But, on a motion for a judgment notwithstanding the verdict, in determining whether a case was made for the jury, we are to consider the evidence in the view most favorable to the appellant.

■■ The question is not whether the respondent's treatment of the deceased was proper and adequate under the circumstances, but whether there is any substantial evidence, or inference from the evidence, from which reasonable minds could conclude that the respondent's failure to properly treat the deceased, admitting improper treatment, was the cause of his death; not necessarily the certain cause, but the most probable cause.

In *Hessler v. Moore,* 188 Wash. 80, 61 P. (2d) 1001, in affirming a judgment notwithstanding the verdict, the court said:

"The rule of law has long been settled in this state. Very recently, it was expressed as follows:

" 'It is undoubtedly true that, in determining the cause of a death for which recovery is sought, the jury may not speculate or conjecture as between several causes. That is to say, where the evidence goes no further than to show that death may have resulted from one of several causes, for one or more of which there is liability, and for another or others of which there is none, then the jury cannot speculate or conjecture and return a verdict as for a cause for which there is liability.' *Hill v. Great Northern Life Ins. Co.,* 186 Wash. 167, 57 P. (2d) 405.

"The language just quoted may be supplemented by the following:

" 'A plaintiff in this character of case is not obligated to establish the material facts essential to a recovery beyond a reasonable doubt. Such a rule would amount to a denial of justice. It is sufficient if his evidence affords room for men of reasonable minds to conclude that there is a greater probability that the accident causing the injury happened in such a way as to fix liability upon the person charged with such liability, than it is that it happened in a way for which the person so charged would not be liable.' *St. Germain v. Potlatch Lumber Co.*, 76 Wash. 102, 135 Pac. 804.

"These two extracts read together seem to fairly state the law on this question."

Considering the desperate state of the deceased when he was brought to the clinic, can it be said that the evidence affords room for men of reasonable minds to conclude that there was a greater probability that death resulted from the respondent's negligent care of the deceased; or, stating the question in another way, a greater probability that death would not have resulted but for the lack of proper treatment?

We do not think reasonable minds could so conclude. The jury's verdict, in awarding the appellant her out-of-pocket funeral expenses only and nothing for loss sustained by reason of her son's death, would seem to indicate that the jury was not strongly impressed with the strength of her case.

In view of what we have already said, it is unnecessary to discuss the appellant's further assignment of error, based upon the trial court's denial of her motion for an increase of the jury's award in the additional sum of fifteen hundred dollars.

The judgment is affirmed.

BLAKE, C. J., STEINERT, BEALS, and JEFFERS, JJ., concur.