[No. 27823.   Department One.   March 13, 1940.]

NICHOLAS A. ATKINS *et al., Respondents,* v.
NORMAN WARD CLEIN *et al., Appellants.*[1]

[1]Reported in 100 P. (2d) 1.

*Kahin, Carmody & Schramm,* for appellants.

*Kennett & Benton,* for respondents.

MAIN, J.—This action was brought to recover damages for malpractice. The cause was tried to the court and a jury, and resulted in a verdict in favor of the defendants. The plaintiffs moved for a new trial upon a number of grounds. The motion was granted on the specific ground, as recited in the order, that there had been error in the instructions. From the order granting a new trial, the defendants appealed.

The appellants Norman Ward Clein and L. Bradford Ostrom will be referred to as though they were the only parties on that side of the controversy. Both physicians specialize in the diseases of children. Dr. Clein testified specifically that he held himself out as a specialist in that line of practice. The respondents, Nicholas A. Atkins and Marie A. Atkins, his wife, are husband and wife, and in May, 1937, they were the parents of two children, a girl about two years old and a boy approximately nine months old.

May 25, 1937, Mrs. Atkins telephoned Dr. Clein that her husband, daughter, and son were all sick, and desired him to come out to see them. Dr. Clein told her that he was unable to make the call, but would send Dr. Ostrom, who called at the house on that day and examined both the boy and girl, the husband being at work at the time. He found both children suffering from a condition which he diagnosed as a common cold. The boy was suffering from nausea, diarrhea, and an inflamed throat, and had a temperature of 102.

On the day following, the boy's condition was about

the same, but, during the afternoon of May 28th, he became very much worse. His breathing was heavy, and Dr. Ostrom was called to see him again that evening. When the call was made, the boy's heavy breathing had existed for four hours or more. It was of such a character that Mr. and Mrs. Atkins both testified that, when he was in an upstairs room in bed, his breathing could be heard downstairs. When the doctor arrived, he examined him and he had a temperature of 104.

What the doctor did and said on his first call, is a matter in dispute between him and Mrs. Atkins. What he did and said on the second call is a matter in dispute between him and Mr. and Mrs. Atkins. The boy's condition was such that, when the doctor called the second time, he was asked to take him to the hospital, and, in reply to this, he said that the boy was not sick and all he needed was rest in bed. The following morning, or the 29th, Mr. and Mrs. Atkins telephoned the doctors that they were taking the boy to the hospital, and asked them to meet them there, which they did. When the boy got to the hospital, he was caused to be placed in an oxygen tent by Dr. Clein, where he remained. Later in the day, his condition became so bad that a throat specialist was called, and he performed an operation on his throat. The result was that the boy died two days later, or on the morning of May 31st.

The first question is whether there was an error in the instructions. To state the matter more particularly, in what is referred to as instruction No. 7, the jury were told that, when a specialist assumes to diagnose a patient's condition and treat him, the law requires that he possess that knowledge and that degree of professional skill usually possessed by specialists engaged in like practice in the same or similar communities. In other instructions, the jury were told that a specialist

was held to that degree of care and skill used by physicians generally at the time and in the locality.

That these instructions are in conflict, there can be no question. A physician who holds himself out as having special knowledge and skill in the treatment of a particular organ or disease is bound to bring to the discharge of his duty to patients employing him as a specialist that degree of skill and learning ordinarily possessed by physicians who devote special attention and study to such organ or disease, practicing in the same community. 21 R. C. L. 387; 48 C. J. 1116. The rule of the text has been recognized by this court in *Sears v. Lydon,* 169 Wash. 92, 13 P. (2d) 475.

It is said, however, that the rule has heretofore been applied to a physician who specializes in the treatment of a particular disease or organ, and that it has not been applied to a group, such as a doctor who specializes in the treatment of children. It may be admitted that no case has been called to our attention where the rule has been applied to such a group. We see no reason, however, why a doctor who holds himself out as a specialist in the treatment of the diseases of children should not be held to the same degree of care that other doctors, practicing the same specialty in the same community, exercise. In our opinion, instruction No. 7 was correct.

■ It has frequently been held that, where instructions are inconsistent and contradictory, involving a material point in the case, their submission to the jury is prejudicial, for the reason that it is impossible to know what effect they may have had on the verdict. *Mosso v. Stanton Co.,* 75 Wash. 220, 134 Pac. 941, L. R. A. 1916A, 943; *Paysse v. Paysse,* 84 Wash. 351, 146 Pac. 840; *Babcock v. M. & M. Const. Co.,* 127 Wash. 303, 220 Pac. 803. There are other cases to the same effect, but

the rule is so well-settled that there is no occasion here for assembling them.

It is further said that the trial court erred, even though the instructions were inconsistent, in granting a new trial, because the evidence was not sufficient to take the case to the jury.

It is not necessary that a case of malpractice be proved by direct and positive evidence. It may be proved by a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. *Helland v. Bridenstine*, 55 Wash. 470, 104 Pac. 626; *Jordan v. Skinner*, 187 Wash. 617, 60 P. (2d) 697; *Gross v. Partlow*, 190 Wash. 489, 68 P. (2d) 1034.

As already stated, the evidence as to what Dr. Ostrom did and said on each of his two visits is disputed, as to the first call, by Mrs. Atkins, and as to the second call, by both Mr. and Mrs. Atkins. In addition to this, some days after the boy had died, Mr. Atkins went to the office of the doctors and had a conversation with Dr. Clein, Dr. Ostrom being present. In this conversation, he made the statement that he had asked the doctor to take the boy to the hospital on the evening of the 28th, and that the doctor had said the boy was not sick, that all that he needed was rest in bed. It will be remembered that, at this time, the boy's temperature was 104, and his breathing was so heavy that it could be heard in a downstairs room. In reply to this statement, Dr. Ostrom said that it did not require a doctor to determine that a child, with a temperature of 104 degrees and breathing so heavily that it could be heard from an upstairs room to a downstairs room, was sick. Dr. Clein replied:

"I said that is a kind of silly statement, because if he had a temperature of 104 and somebody said he wasn't sick, I would think he was crazy. That is my opinion as a medical man."

If the doctor made the statement that Mr. and Mrs. Atkins say that he made, it would seem clear that the question of malpractice was a question for the jury.

■ It is said, however, that there is no evidence from which the jury could find that the boy would have lived had he received proper treatment. The respondents were only required to prove that there was a greater probability that the boy would have lived, had he received proper treatment, than that he would have died. *St. Germain v. Potlatch Lumber Co.*, 76 Wash. 102, 135 Pac. 804; *Nelson v. Columbia Clinic, Inc.*, 1 Wn. (2d) 558, 96 P. (2d) 575.

■ Mrs. Atkins, when testifying, made the statement that, some days after the death of the boy, she had a conversation with a doctor, who said that, if the boy had been taken to the hospital earlier, he would have lived, or something to that effect. On cross-examination, she was asked who the doctor was, and she named the throat specialist who performed the operation on the boy. This evidence went in without objection. Later, the doctor was called and unequivocally denied it.

What Mrs. Atkins testified to was, of course, hearsay, but, inasmuch as it went in without objection, it was proper for the jury to consider it. *State ex rel. Race v. Cranney*, 30 Wash. 594, 71 Pac. 50; *Beebe v. Redward*, 35 Wash. 615, 77 Pac. 1052. The question was one for the jury.

The trial court properly granted the motion for a new trial.

The order appealed from will be affirmed.

BLAKE, C. J., MILLARD, and ROBINSON, JJ., concur.

SIMPSON, J. (dissenting)—As I view this case, the evidence produced at the trial was not sufficient to permit a verdict for respondents. For this reason, ques-

tions relative to whether there was error in the instructions given are not controlling in the disposition of this appeal.

In the following cases, we held that, if the evidence did not disclose facts sufficient to support a verdict for the proponent of the motion, it was error for the trial court to grant a new trial for irregularities committed in submitting the case to the jury: *Grass v. Seattle,* 100 Wash. 542, 171 Pac. 533; *Adams v. Anderson & Middleton Lumber Co.,* 124 Wash. 356, 214 Pac. 835; 127 Wash. 678, 221 Pac. 993; *Humphreys v. Seattle,* 152 Wash. 339, 227 Pac. 834, 281 Pac. 994; *Thornton v. Eneroth,* 177 Wash. 1, 30 P. (2d) 951.

Before undertaking an examination of the evidence upon which the majority relies, as bearing upon the issue of appellants' negligence, it seems appropriate to recall several legal principles relating to the duties imposed upon members of the medical profession.

A physician or surgeon is not required to exercise the highest degree of learning, care, and skill in the treatment of his patients. Negligence of a physician or surgeon is the failure to exercise that degree of care, diligence, and skill which is ordinarily possessed and exercised by members of the medical profession in the same line of practice in the same or a similar locality. *Kemp v. McGillivray,* 129 Wash. 592, 225 Pac. 631; *Hollis v. Ahlquist,* 142 Wash. 33, 251 Pac. 871; *Peterson v. Hunt,* 197 Wash. 255, 84 P. (2d) 999; 48 C. J. 1113, § 101; 21 R. C. L. 381, § 27.

A specialist is not held to the exercise of a greater degree of care in the diagnosis or treatment of a particular organ, injury, disease, or group of people than that ordinarily possessed and exercised by those who devote special study and attention to that restricted field of medical practice in the same or a similar locality, having regard to the state of scientific knowledge

at the time. *Beach v. Chollett,* 31 Ohio App. 8, 166 N. E. 145; *Pantazatos v. Jelm,* 17 Ohio App. 258; *Baker v. Hancock,* 29 Ind. App. 456, 63 N. E. 323, 64 N. E. 38; *Rann v. Twitchell,* 82 Vt. 79, 71 Atl. 1045, 20 L. R. A. (N. S.) 1030.

The law does not hold that physicians guarantee results, nor does it require that the result be what is desired. *Williams v. Wurdemann,* 71 Wash. 390, 128 Pac. 639; *Lorenz v. Booth,* 84 Wash. 550, 147 Pac. 31; *Hollis v. Ahlquist, supra; Brant v. Sweet Clinic,* 167 Wash. 166, 8 P. (2d) 972; *Barker v. Weeks,* 182 Wash. 384, 47 P. (2d) 1.

A physician does not incur liability for his mistakes if he has used methods recognized and approved by those reasonably skilled in the profession. *Wells v. Ferry-Baker Lumber Co.,* 57 Wash. 658, 107 Pac. 869, 29 L. R. A. (N. S.) 426. This rule should also apply to specialists. They should be held to the use of methods and to the application of that degree of skill, learning, and care which is recognized and approved by fellow specialists.

As a general rule, questions involving scientific or medical knowledge must be determined by experts. *Dahl v. Wagner,* 87 Wash. 492, 151 Pac. 1079; *Dishman v. Northern Pac. Ben. Ass'n,* 96 Wash. 182, 164 Pac. 943; *Howatt v. Cartwright,* 128 Wash. 343, 222 Pac. 496; *Brear v. Sweet,* 155 Wash. 474, 284 Pac. 803; *Boyce v. Brown,* 51 Ariz. 416, 77 P. (2d) 455.

"Ordinarily, where the exercise of proper skill or care on the part of a physician or surgeon is in issue, expert medical testimony is essential. The reason is that in most cases a layman can have no knowledge whether the proper treatment was given." 48 C. J. 1150, § 157.

The supreme court of Arizona in *Boyce v. Brown, supra,* laid down definite rules as to what expert testimony must show in order to establish negligence:

"There are certain general rules of law governing actions of malpractice, which are almost universally accepted by the courts, and which are applicable to the present situation. We state them as follows: (1) One licensed to practice medicine is presumed to possess the degree of skill and learning which is possessed by the average member of the medical profession in good standing in the community in which he practices, and to apply that skill and learning, with ordinary and reasonable care, to cases which come to him for treatment. If he does not possess the requisite skill and learning, or if he does not apply it, he is guilty of malpractice. *Butler v. Rule,* 29 Ariz. 405, 242 Pac. 436. (2) Before a physician or surgeon can be held liable as for malpractice, he must have done something in his treatment of his patient which the recognized standard of good medical practice in the community in which he is practicing forbids in such cases, or he must have neglected to do something which such standard requires. 48 C. J. 1112, and cases cited. (3) In order to sustain a verdict for the plaintiffs in an action for malpractice, the standard of medical practice in the community must be shown by affirmative evidence, and, unless there is evidence of such a standard, a jury may not be permitted to speculate as to what the required standard is, or whether the defendant has departed therefrom. *Butler v. Rule, supra; Rising v. Veatch,* 117 Cal. App. 404, 3 Pac. (2d) 1023; *Connelly v. Cone,* 205 Mo. App. 395, 224 S. W. 1011. (4) Negligence on the part of a physician or surgeon in the treatment of a case is never presumed, but must be affirmatively proven, and no presumption of negligence nor want of skill arises from the mere fact that a treatment was unsuccessful, failed to bring the best results, or that the patient died. 48 C. J. 1142, 1143, and cases cited. (5) The accepted rule is that negligence on the part of a physician or surgeon, by reason of his departure from the proper standard of practice, must be established by expert medical testimony, unless the negligence is so grossly apparent that a layman would have no difficulty in recognizing it. Herzog, Medical Jurisprudence, § 192; *Butler v. Rule,* 33 Ariz. 460, 265 Pac. 757; 48 C. J. 1150, and cases cited. (6) The testimony of other physicians that they would have

followed a different course of treatment than that followed by the defendant is not sufficient to establish malpractice unless it also appears that the course of treatment followed deviated from one of the methods of treatment approved by the standard in that community. *Hazen v. Mullen,* 32 Fed. (2d) 394, 59 App. D. C. 3."

The position taken by the majority—that evidence was adduced sufficient to warrant a verdict for respondents upon the issue of malpractice—is based squarely upon testimony of Mr. and Mrs. Atkins to the effect that Dr. Clein made this statement:

"I said that is a kind of silly statement, because if he had a temperature of 104 and somebody said he wasn't sick, I would think he was crazy. That is my opinion as a medical man."

Considered in the light of the rules which have just been stated, the evidence upon which the majority relies did not warrant a finding by the jury that appellants were guilty of malpractice. No evidence was introduced which established, or tended to establish, the usual methods pursued by specialists, or by regular physicians, in Seattle or similar communities. The record discloses nothing which shows what was the recognized treatment of patients having the symptoms displayed by respondents' child. There is nothing in the evidence which establishes directly or by inference that appellants failed in any particular to do all those things which are required of a child specialist. Without such evidence, there was nothing for the jury to consider.

The burden was upon respondents to prove by competent expert witnesses all of the elements of negligence with which appellants are charged. Implicit within this rule is the requirement that the applicable standard of care and the determination of what are the approved methods of diagnosis and treatment must be established by experts whose practice is similar to that

of those charged with malpractice. The doctor who made the statement to Mrs. Atkins that earlier hospitalization would have saved the child, or that doctors specializing in children's diseases would have sent it to the hospital sooner than did appellants, was not a child specialist. The statement attributed to him can be regarded as nothing more than speculation.

As I view the evidence and the principles of law which must be applied, respondents proved no more than that unfortunate consequences attended the treatment given by appellants.

Judgment should be entered upon the verdict of the jury.

## On Rehearing.

### [*En Banc.* July 18, 1940.]

PER CURIAM.—Upon a rehearing *En Banc,* a majority of the court adheres to the opinion heretofore filed herein.

BEALS, J., concurs in the result.

SIMPSON, J. (dissenting)—I adhere to the views expressed in the dissenting opinion.

STEINERT, J., concurs with SIMPSON, J.

ROBINSON, J. (dissenting)—Although I signed the Departmental opinion in this case and was inclined to adhere to it in the conference following the hearing *En Banc,* I have, after further consideration, concluded that it ought either to be set aside or materially modified. I fear that the opinion, as it stands, may be justly interpreted as holding that a jury may find that a physician's mere mistake of judgment, such as concluding that a patient's condition is not so serious as to require him to make daily calls, or sufficiently serious as to require hospitalization, constitutes malprac-

tice. I assume that no one will contend that this has hitherto been the law.

It may be conceded that it is within the province of the court to adopt new principles from time to time, or at least to make liberal applications of the old, in order to keep the common law responsive to changed conditions. But the question as to whether such action shall be taken, is not to be determined by the supposed hardships of an individual case. The test is whether or not an enlightened public policy requires it.

I cannot conceive how it can be thought that public policy or concern for the general public interest requires the adoption of the rule which the majority opinion seems to approve. It is loudly, vociferously, and continuously asserted by the advocates of socialized medicine that medical service is beyond the reach of many people because of its cost. If there be any truth in this assertion, is it wise to adopt a rule which must inevitably greatly increase such costs? I say inevitably, because it is clear that, if such a rule is to obtain, a physician can only adequately protect himself by making daily calls on every patient and by ordering his patients into hospitals upon the first indications of danger, lest, if he fail to do so and there be an unexpected fatal result, a jury of laymen, with no experience whatever in diagnosis or prognosis, may find him guilty of malpractice, to his damage in property loss and injury to his professional standing.

I cannot believe that the bringing about of such a condition is in the public interest, and I, therefore, dissent.